```
 1                    IN THE UNITED STATES DISTRICT COURT.
                      FOR THE SOUTHERN DISTRICT OF IOWA
 2                          DAVENPORT DIVISION


 3
     UNITED STATES OF AMERICA,        )
 4                                    )
              Plaintiff,              )  ORIGINAL
 5                                    )
              VS.                     )  CRIMINAL NO. 3:20-cr-30
 6                                    )
     LAMARK ARMOND COMBS JUNIOR,      )
 7                                    )
              Defendant.              )
 8                                    )


 9
                         TRANSCRIPT OF PROCEEDINGS
10                       BEFORE THE HONORABLE STEPHEN B. JACKSON JUNIOR
                         Tuesday, April 28, 2020; 1:28 p.m.
11                       DAVENPORT, IOWA


12
     FOR THE PLAINTIFF:
13   TORRIE JEANE SCHNEIDER
     Assistant United States Attorney
14   131 East Fourth Street
     Davenport, IA  52801
15


16   FOR THE DEFENDANT:
     PARRISH KRUIDENIER DUNN BOLES GRIBBLE GENTRY
17   BROWN & BERGMANN, L.L.P.
     By:
18   ALFREDO G. PARRISH
     Attorney at Law
19   2910 GRAND AVENUE
     Des Moines, IA  50312
20


21


22


23


24              LINDA FAUROTE-EGBERS, CSR 622(IA), FCRR, RMR
                     FEDERAL OFFICIAL COURT REPORTER
25                       131 East Fourth Street
                         Davenport, Iowa  52801
```

1                          I N D E X

2    WITNESS                ATTORNEY                        PAGE

3
     Sean Johnson           Mr. Parrish                       29
4                           Ms. Schneider                     49
                            Mr. Parrish                       51
5

6    Leslie Smith           Mr. Parrish                       54
                            Ms. Schneider                     57
7

8    LaMark Combs Senior    Mr. Parrish                       61
                            Ms. Schneider                     75
9                           Mr. Parrish                       79

10
     Jacnita Combs          Mr. Parrish                       81
11                          Ms. Schneider                     89

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  Good afternoon, everyone.  Please have a

2  seat.

3            MR. PARRISH:  Good afternoon, Your Honor.

4            THE COURT:  Good afternoon, everyone.

5            This case is United States of America versus LaMark

6  Armond Combs, this is case 3:20-30.  Today is the date and time

7  set for arraignment for Mr. Combs and also hearing on the

8  government's request for detention of him.

9            I note first for the record, Assistant United States

10  Attorney Torrie Schneider appears for the government in open

11  court.  Mr. Combs does not appear in open court, but he appears

12  by videoconference from the Muscatine County Jail and his

13  attorney, Alfredo Parrish, appears on his behalf in open court.

14            First, Mr. Combs, I want to make sure that you can

15  hear all of us and see all of us today.  I am Judge Jackson.

16  Can you see and hear me?

17            THE DEFENDANT:  Yes.

18            THE COURT:  Okay.  And I would ask our clerk, if we

19  can zoom in the cameras and refocus a camera on Mr. Parrish.

20            Can you see the Assistant United States Attorney?  I

21  will have her raise her hand.

22            THE DEFENDANT:  Yes.

23            THE COURT:  We are going to adjust the camera so you

24  can see everyone better and see your attorney, Mr. Parrish, as

25  well in a moment; but I will let you know, Mr. Combs, that you

1   are appearing by videoconference today.  You have the right to

2   be personally present for this hearing.  You have the right to

3   be personally present to hear witnesses testify and to be with

4   your attorney.

5          I understand that you are waiving those rights today

6   and agree to appear by videoconference for this hearing, is that

7   correct?

8          THE DEFENDANT:  Yes.

9          THE COURT:  And I want you to know, Mr. Combs, at any

10   time if you cannot hear or see any of us or if you need to

11   discuss things with your attorney, first of all, if you cannot

12   see or hear any of us at any time, I want you to please raise

13   your hand and let us know.

14          Secondly, if you have the need to discuss anything

15   with your attorney or if he wants to discuss anything with you,

16   there is a telephone with you in the video room at the Muscatine

17   County Jail and Mr. Parrish has that number and can call you to

18   talk with you.

19          Do you understand that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Okay.  Just raise your hand and let us

22   know that you want to talk to your attorney.

23          Can you now see your attorney, Mr. Parrish, as well?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Okay.  Mr. Parrish, your client consents

1  to this matter being conducted by videoconference, both the

2  arraignment and detention hearing, is that correct?

3            MR. PARRISH:  He does, Your Honor.

4            THE COURT:  And, Ms. Schneider, does the government

5  consent to these hearings being done by videoconference?

6            MS. SCHNEIDER:  Yes, Your Honor.  Shall we stand or

7  remain seated for the recording?

8            THE COURT:  Please remain seated so that we can keep

9  you close to the microphones.

10            I want to remind you again, Mr. Combs, your right to

11  remain silent concerning the charges against you.  That means

12  you are not required to say anything to anyone.  If you give up

13  that right and make a statement, you need to know that the

14  prosecutor can and probably will use anything and everything

15  that you say against you, therefore I strongly suggest you not

16  say anything to anyone unless you and your attorney decide it is

17  in your best interest to do so.

18            If you have already made or given a statement, you are

19  not required to say anything else.  In the future if you decide

20  to make a statement, you can change your mind and stop talking

21  at any time.  You also have the right to have an attorney

22  present during any questioning about these matters.

23            Do you understand your right to remain silent, Mr.

24  Combs?

25            THE DEFENDANT:  Yes.

1            THE COURT:  Mr. Parrish, do you and your client both

2   have a copy of the Indictment?

3            MR. PARRISH:  We do, Your Honor.

4            THE COURT:  Okay.

5            MR. PARRISH:  Well, he should have picked one up.  I

6   sent him a letter down to the jail, but I have gone over it with

7   him; but I did send him a note, I don't know whether he received

8   it or not, to go and get access to it that was e-mailed at the

9   jail.

10            THE COURT:  You do have a copy of the Indictment,

11   right?

12            MR. PARRISH:  Yes, Judge.

13            THE COURT:  Mr. Combs, do you have a copy of the

14   Indictment?

15            THE DEFENDANT:  Not with me at the moment.

16            THE COURT:  But did you receive one at the jail as Mr.

17   Parrish indicated?

18            THE DEFENDANT:  Yes.

19            THE COURT:  Okay.  Good enough.

20            I am going to ask Ms. Schneider to please advise Mr.

21   Combs of the charges against him and the maximum penalties for

22   those charges.

23            MS. SCHNEIDER:  Thank you, Your Honor.

24            Mr. Combs, you have been charged in a three-count

25   Indictment handed down by the Grand Jury charging you in Count 1

1  with production of child pornography on or between February 10,

2  2019, and June 16, 2019, in the Southern District of Iowa; and

3  Count 2 is the same charge, production of child pornography, on

4  or between March 1st and March 30, 2019.  Both of these offenses

5  are in violation of Title 18, United States Code, Sections

6  2251(a) and 2251(e).

7          The maximum penalty for these offenses is a minimum 15

8  years' imprisonment up to your natural life to be followed by a

9  term of supervised release of a minimum of five years up to your

10  natural life, a fine of $250,000, and a $100 special assessment.

11          Count 3 alleges enticement of a minor on or between

12  September 2018 and April of 2019 in the Southern District of

13  Iowa in violation of Title 18, United States Code, Section

14  2422(b).

15          This offense carries a maximum penalty of -- a minimum

16  of 10 years' imprisonment up to your natural life to be followed

17  by a term of supervised release of five years up to your natural

18  life, a fine of $250,000, and a $100 special assessment.

19          The Grand Jury has also returned a Notice of

20  Forfeiture that, upon your conviction of Counts 1, 2, or 3, that

21  you would forfeit your right to any of the property or items

22  that were used in the commission of those offenses.  Thank you.

23          THE COURT:  Thank you.

24          Mr. Parrish, can you confirm, is your client charged

25  in his true and correct name with correct spellings?

1          MR. PARRISH:  It should be Junior, Your Honor.

2          THE COURT:  Other than that, are his names spelled

3    correctly and is his name true and correct?

4          MR. PARRISH:  Correct, Your Honor.

5          THE COURT:  All right.  And does he request a further

6    formal reading of the Indictment?

7          MR. PARRISH:  Your Honor, we would waive a formal

8    reading of the Indictment, would enter a plea of not guilty to

9    the charges -- each of the three counts, Your Honor.

10         THE COURT:  And denial of the Notice of Forfeiture?

11         MR. PARRISH:  Correct.

12         THE COURT:  The Court accepts Mr. Combs' plea of not

13   guilty to Counts 1, 2, and 3 and notes his denial of the Notice

14   of Forfeiture.

15         Counsel, our next trial date would be June 1st, but,

16   Mr. Parrish, I don't know if that is enough time for you.  If

17   you would want to continue that, I would entertain that.

18         What is your preference for scheduling?

19         MR. PARRISH:  Well, Judge, as you are aware, we do

20   have the Reed case, we were actually working on it this morning,

21   I was telling Ms. Schneider; but I would think, Judge, isn't

22   that a little early than the --

23         THE COURT:  June 1st is within the 70-day speedy trial

24   time frame.

25         MR. PARRISH:  I would suggest, Judge, at a minimum we

1  are going to consider waiving that.  I don't have a waiver yet.

2  I would make sure it is on file within the period of time.  I

3  would try to get it in by next week or so; but we would waive

4  that time.

5       THE COURT:  Okay.  So would you be moving to continue

6  the June 1st trial date, is that what you are saying?

7       MR. PARRISH:  Correct.

8       THE COURT:  All right.

9       MR. PARRISH:  The rules -- I don't need to get into

10  that, Judge, but I thought we were out past July 17th right now

11  anyway.

12       THE COURT:  July 6th, I understand, that's 69 days;

13  but I didn't know if you wanted to visit the scheduling with

14  that in the meantime in terms of a more realistic trial date for

15  Mr. Combs if June 1st or even July 6th wasn't realistic.

16       MR. PARRISH:  My thought at this point, Judge, it is

17  not realistic from what I know about the case so I would visit

18  with him, I would ask for -- to give me at least, considering

19  the problems of visitation now, about seven days to at least get

20  that accomplished.

21       I have been in close contact with his parents.  I

22  would want to update them on it so if you give me about seven

23  days, Judge, I could file an appropriate Motion for -- to waive

24  that.

25       THE COURT:  To continue?

1          MR. PARRISH:  Yes, Judge.

2          THE COURT:  All right.  So at this time we will set

3  trial for June 1st of 2020 before Chief Judge John Jarvey.

4  Pretrial Motion deadline at this point will be May 11, 2020.

5  Plea entry deadline would be May 18, 2020.

6          When can Rule 16 materials be produced by the

7  government, Ms. Schneider?

8          MS. SCHNEIDER:  A large portion of them were provided

9  shortly before this hearing so I would say if we can have two

10  weeks to compile the rest as a usual date, that would be fine.

11          THE COURT:  Okay.  Anticipating that there's going to

12  be a Motion to Continue filed, the Pretrial Motion deadline

13  would be May 11th which would be before two weeks so May 8th,

14  the Friday before.

15          Would that be acceptable to the government?

16          MS. SCHNEIDER:  I think that would be fine, Your

17  Honor.

18          THE COURT:  That would be fine?  Okay.

19          Rule 16 materials are due by May 8th.  Pretrial Motion

20  deadline is May 11th.  Reciprocal discovery is due by May 15th.

21  Again, the plea entry deadline is May 18th.

22          Mr. Combs, what the plea entry deadline is, if should

23  you choose at some point in the future to plead guilty, in order

24  for you to receive consideration by the District Court for what

25  is called acceptance of responsibility, a key factor that the

1    Judge will consider is whether any plea has been entered on or

2    before that plea entry deadline and that is something that Mr.

3    Parrish will make sure to talk to you about.  I am certain

4    because he is well aware of what that is and keeps his clients

5    well advised and so I will set the June 1st trial date at this

6    point, counsel.  It is within the 70-day speedy trial deadline.

7    We will call it a placeholder anticipating, Mr. Parrish, that

8    once you have a chance to meet with your client, and it sounds

9    like you have the bulk of the discovery, consider how much time

10   you need, you can file your Motion to Continue and put that in

11   there.

12           Does that sound acceptable?

13           MR. PARRISH:  It does, Judge.  Thank you.

14           THE COURT:  Is that acceptable to the government?

15           MS. SCHNEIDER:  Yes, Your Honor.

16           Are we setting a scheduling conference or will it just

17   be done by a paper Motion by defense counsel?

18           THE COURT:  That's a fair question.

19           I am not going to schedule a scheduling conference,

20   but if I don't see something in a week or so from Mr. Parrish, I

21   will do that.

22           MS. SCHNEIDER:  Thank you.

23           THE COURT:  Anything further on the matter of

24   arraignment from the government?

25           MS. SCHNEIDER:  No, Your Honor.  Thank you.

1          THE COURT:  Mr. Parrish, for Mr. Combs?

2          MR. PARRISH:  No, Your Honor.  Thank you.

3          THE COURT:  Thank you.

4          Is the government ready to proceed concerning its

5  request for detention?

6          MS. SCHNEIDER:  Yes, Your Honor.

7          THE COURT:  And, Ms. Schneider, do you plan on witness

8  testimony today?

9          MS. SCHNEIDER:  The government will proffer.

10         THE COURT:  Any objection to proffer, Mr. Parrish?

11         MR. PARRISH:  Your Honor, I sent a note out today

12  requesting on Rule 11, that the material be provided to me.

13  About 20 minutes ago I did get -- I didn't bring my computer in

14  unfortunately, trying to limit what I bring into the courtroom,

15  but it is on my cell phone.  I started going through it.

16         I am not going to ask for additional time to do it

17  because my questions that I may have for the agent may not

18  reference that so I am okay by not taking a recess, Judge, to

19  study this.  I am ready to proceed; but I did get -- I haven't

20  counted the total number of pages, but I am going by Ms.

21  Schneider's representation, about 72 pages, and they redacted

22  the material this morning.

23         THE COURT:  Okay.  I am not sure I caught all of that.

24  You are leaning away from the microphone a little bit so --

25         MR. PARRISH:  I'm sorry.

1          THE COURT:  -- we have a lot of mics going here so

2   there's a lot of ambient noise which makes it more difficult to

3   hear.

4          MR. PARRISH:  Let me restate it briefly, Judge.

5          THE COURT:  I also want to make sure Mr. Combs can

6   hear too.

7          MR. PARRISH:  Thank you.

8          THE COURT:  Why don't you move your microphone so if

9   you want to be looking this way.  Does the base move?

10         MR. PARRISH:  Thank you, Judge.  Are you okay?

11         THE COURT:  What I understand is, first of all, do you

12   object -- is there any objection to the government proceeding by

13   proffer this afternoon?

14         MR. PARRISH:  No, Judge, as long as I have the

15   opportunity to cross-examine the agent with the material.

16         THE COURT:  You absolutely will; and secondly, I think

17   you referenced receiving reports?

18         MR. PARRISH:  I did, I received them on my phone.  I

19   did not bring my computer in, but I am okay to proceed with the

20   questions I have relevant to detention.

21         THE COURT:  Okay.

22         MR. PARRISH:  I'm comfortable with what I have.

23         THE COURT:  You said you just got those reports 20 or

24   30 minutes ago.  If you want time to review them before we go

25   forward, you can have that time.

1           MR. PARRISH:  Judge, I am comfortable with proceeding.

2    Thank you.

3           THE COURT:  All right.  And so your agent is here to

4    testify though on cross-examination, is that correct, Ms.

5    Schneider?

6           MS. SCHNEIDER:  Yes, Your Honor.

7           THE COURT:  You may proceed.

8           MS. SCHNEIDER:  Thank you.

9           First of all, the government would proffer the

10   Pretrial Services Report from the Southern District of Georgia

11   that has been adopted by probation in the Southern District of

12   Iowa.

13          Additionally, the government would move to strike the

14   filings of defendant yesterday and today, the rebuttal to

15   detention that was filed yesterday and the brief that was filed

16   today.  Those are improperly filed with the Court prior to the

17   detention hearing.  They contain many factual inaccuracies and

18   they assume facts not in evidence that appear to be a way of

19   getting around or attempting to get around calling certain

20   witnesses, so at this point the government would either move to

21   strike those filings or request that the Court disregard them in

22   its decision.

23          THE COURT:  What are the docket numbers you are

24   referring to?

25          MS. SCHNEIDER:  Dockets 29 and 30.

1          THE COURT:  Any response to that?  Is there a rule of

2   procedure or criminal procedure that you are operating under

3   with your Motion to Strike?

4          MS. SCHNEIDER:  Not specifically for the Motion to

5   Strike; but regarding just the request to disregard under the

6   statute for the detention hearing, 3142, it states that the

7   Court must hold a hearing in order to make its determination.

8   These filings are outside of the hearing, which is today, where

9   we will be presenting evidence, both parties will be presenting

10  evidence.

11         THE COURT:  Mr. Parrish, any response to that?

12         MR. PARRISH:  Briefly.  The only response I have,

13  Judge, is that I believe the law requires at detention hearings

14  that all matters are admissible, there's no standard as if it is

15  an evidentiary hearing at trial, including hearsay exceptions,

16  we would ask the Court -- we will be calling witnesses that will

17  directly refer to the documents and the accuracy -- inaccuracy

18  of those can be vetted out at that point.

19         THE COURT:  Thank you.

20         Please go forward, Ms. Schneider.

21         MS. SCHNEIDER:  Thank you.

22         If called to testify as a witness, Detective Sean

23  Johnson from the Davenport Police Department would testify that

24  on June 4, 2018, Davenport police received a report of a sexual

25  assault between the defendant, who was 18 years old, and a

1   13-year-old girl.  That assault was reported to have occurred on

2   June 1, 2018.

3           The 13-year-old girl reported that the defendant

4   picked her up and brought her to a movie where she was denied

5   entrance and so they went to a park and the defendant had sexual

6   intercourse with the 13-year-old on a blanket and the

7   13-year-old reported that the defendant knew her age based on

8   looking at her Facebook page, that she knew that he had done

9   that.  The defendant told her that he likes to take girls'

10  virginities and that he always used that blanket.

11          THE COURT:  Just make sure you go a little slower.

12          MS. SCHNEIDER:  Thank you.

13          THE COURT:  Thank you.

14          Just for the record, you were not going that fast, but

15  there is a bit of a lag, so I just want to make sure.

16          MS. SCHNEIDER:  I understand.  Speed is something I

17  can always be warned on.

18          Officers seized the defendant's cell phone and blanket

19  pursuant to a warrant on June 6th.  The blanket was sent to the

20  DCI lab for DNA testing where a number of DNA profiles were

21  revealed, one of which was confirmed to match both the defendant

22  and the 13-year-old.  That DNA report did not come back until

23  June 27, 2019.

24          While the police were still investigating that June

25  assault, they received the report of a sexual assault between

1  the defendant and a 15-year-old girl on December 4, 2018.  That

2  assault was reported to have occurred overnight of November 29th

3  to the 30th at the defendant's sister's home in Davenport.  The

4  defendant turned 19 on the 30th so he was 18, turning 19.

5      The girl reported that she had told the defendant to

6  stop throughout the assault, but he ignored her.  She stated

7  that the defendant later admitted to her on Snapchat that he

8  should have taken a hint and that he did not think she actually

9  wanted him to stop.  A mutual friend of theirs told the girl

10  that the defendant later admitted that she had told him to stop.

11      While that investigation was ongoing -- in order to

12  investigate that, Detective Johnson had the defendant in to the

13  police department for an interview on January 28, 2019, and

14  Detective Johnson asked the defendant some questions, it was a

15  short interview, and once the questions became more

16  incriminating or about the sexual assault allegation

17  specifically, the defendant ended the interview and left the

18  police department.

19      As that -- these investigations were ongoing, the

20  Davenport Police Department received a third report regarding

21  the defendant on May 26th of 2019.  This time it was sexually

22  explicit photographs on a cell phone belonging to another

23  15-year-old girl.  That girl's mother reported that she found

24  the girl taking nude pictures of herself in the shower and the

25  mother opened the text messages, found a message from the

1  defendant asking her to send him a video of her masturbating and

2  the girl had complied.

3          The girl's mother questioned the girl and learned that

4  the defendant would pick her up from school and have sex with

5  her on three occasions between the end of April to the beginning

6  of May of 2019.  The girl's mother deleted all of those messages

7  as well as defendant's contact information so the girl could not

8  contact the defendant again before reporting this to the police.

9          As a result of that report, Detective Johnson began

10  another investigation and on May 31, 2019, obtained a search

11  warrant to seize another cell phone from the defendant.

12  Detective Johnson responded to Arby's where the defendant was

13  working and Detective Johnson and defendant spoke outside.

14  Detective Johnson asked the defendant for his phone.  The

15  defendant responded that it was inside in the back in the

16  restaurant.  Detective Johnson accompanied the defendant into

17  the back of the restaurant where then the defendant pulled the

18  phone out of his pocket.  The defendant asked to delete photos

19  on it first, but that was obviously denied.

20          Detective Johnson obtained warrants for the contents

21  of the defendant's cell phone and his iCloud and Snapchat

22  accounts.  Both images and videos of suspected child pornography

23  were located.

24          On June 18th Detective Johnson began identifying and

25  interviewing victims who were found on the defendant's devices

or accounts.  First was minor victim number one who -- and that
is how she is referred to in the Indictment so that's how I will
be referring to them.  Minor victim number one was 15 years old
at the time she communicated with the defendant who was 19 years
old.  They communicated between February and June --

THE COURT:  Can you say -- can you tell me the age of
victim one again?

MS. SCHNEIDER:  15 years old.

THE COURT:  Thank you.

MS. SCHNEIDER:  They communicated between February and
June of 2019, although most contact ended in early May.

The majority of the identifiable images and videos of
child pornography located on defendant's devices or accounts
relate to minor victim number one.

Minor victim number one admitted that the defendant
sought her out on Snapchat and misrepresented his age.  He
stated he was 17.  The defendant quickly began wanting sexually
explicit content from minor victim number one and directly asked
her for images and videos.  She reported that she sent the
defendant images and videos of herself engaged in sexually
explicit conduct because the defendant kept asking her.

Minor victim number one stated that all of the
depictions were sent via Snapchat.  Detective Johnson would
testify that due to the way Snapchat is set up, that if one of
the parties blocks the other party, any data that Snapchat had

1  would be -- is gone, is deleted, and through the course of this

2  investigation, the only -- minor victim number one was the only

3  victim at that time who had not yet blocked the defendant so

4  there are messages between minor victim number one and the

5  defendant on Snapchat that are sexually explicit, although they

6  are -- what was obtained from these warrants was primarily the

7  defendant's side of the conversation; however, the rest of the

8  other girls, including the two other victims who are charged, we

9  did not -- Detective Johnson did not seek warrants for their

10  Snapchat accounts because they had already blocked the defendant

11  so nothing would have been able to be obtained from Snapchat.

12        Minor victim number one said that she had sent him the

13  photos and videos because if she didn't, the defendant would

14  become frustrated, mad, and would not talk to her or hang up on

15  her and the photos -- the videos of minor victim number one that

16  were found on the defendant's Snapchat or in his cell phone

17  consist of images or videos of minor victim number one's vagina

18  and anus, minor victim number one masturbating with a Sharpie,

19  and a video of defendant masturbating minor victim number one.

20  She reported that the defendant told her to send the video of

21  her masturbating with a Sharpie and that he had asked her to use

22  different things and whether she had any toys.  He also asked

23  her to use a thicker marker.

24        The Snapchat images show that the defendant knew how

25  old minor victim number one was as he asked her when her

1 birthday was, stating, "June what?"  And he also talked about

2 how she could not yet drive.

3         In addition to the child pornography relating to minor

4 victim number one, there is a large amount of child erotica

5 images on the defendant's phone and accounts that depict minor

6 victim number one in various locations in her house, including

7 in the shower, in various states of undress, including from the

8 -- nude from the waist up.

9         Minor victim number one identified sanitized images of

10 herself.  She also reported that she and the defendant had

11 sexual intercourse two or three times at her residence in

12 Clinton.  She stated that she did not want to have sex with him

13 at first, but he coaxed her into it.  He was also fixated on her

14 becoming pregnant.

15         Minor victim number one reported that the defendant,

16 as I said, drove to her home in Clinton three times and that at

17 the first -- on the first visit the defendant coaxed her into

18 sitting on his lap, told her that he's not a stranger because

19 they had been talking online, and this kind of behavior in order

20 to get her to have sex with him.  She said she did not want him

21 to stay long, but they ended up having sex that defendant

22 initiated.  The defendant also made two videos located on his

23 phone of them simulating sex while they were fully clothed on

24 this occasion.

25         The Snapchat messages between the defendant and minor

1  victim number one are sexually explicit.  In addition, they

2  stated -- the defendant wrote, "I don't understand why you think

3  I don't want to be with you when I've literally went out of my

4  way to drive an hour and back two times already," and he said,

5  "I'm going to be straight up with you.  I was ready for you to

6  be pregnant.  I wouldn't mind you being my baby mama and then in

7  a couple years my wife," and then there were numerous requests

8  for her to send nude images and trying to see her and asking her

9  to sneak out of her window.

10         Minor victim number one reported that they took a

11  break in their relationship in March of 2019 at which time the

12  defendant blocked her on all of the social media accounts and

13  this is corroborated by a Snapchat message in May that the

14  defendant sent one of his best friends saying, "I'm trying to

15  leave shortie from Clinton.  I'm trying, but she won't let me.

16  The problem is I took her virginity too and -- but the last time

17  I broke up with her I blocked her on everything but the

18  difference was I didn't have sex with her yet."

19         Minor victim number two that relates to Count 2 is a

20  16-year-old girl who communicated with the defendant in March of

21  2019 when the defendant was 19 years old.  They met on Facebook,

22  but later communicated via Snapchat, text messages, and

23  FaceTime.  She and the defendant engaged in sexual intercourse

24  and she reports that she believes she contracted a sexually

25  transmitted infection from the defendant.  She said she believed

1  that because the defendant told her that he has, quote, 19

2  bodies, meaning sexual partners.

3        Minor victim number two admitted to sending sexually

4  explicit images and videos of herself to the defendant via

5  Snapchat in response to him asking her to send nudes.  She

6  identified sanitized images of herself.  Again, in order to get

7  her to send those depictions, defendant would tell her that he

8  was horny and that she said that there were times when she did

9  not feel like it, but the defendant pressured and begged her

10  nonstop.  She felt uncomfortable oftentimes, but if she refused,

11  the defendant would stop talking to her and turn off his phone,

12  therefore she felt obligated to do what he asked, which included

13  sending images and videos of her naked, including her vagina and

14  anus.

15        Minor victim number two reported that he -- that the

16  defendant threatened to disseminate some of her images when he

17  was mad at her, but she is unsure whether this ever occurred.

18        Detective Johnson located videos of minor victim

19  number two dancing in the nude revealing her anus on the

20  defendant's devices and accounts which were dated in March of

21  2019 and he also located a screen recording of the defendant

22  where the defendant was deleting images from Snapchat, including

23  an image of a vagina that minor victim number two confirmed was

24  her and that she had asked him to delete those images and wanted

25  proof, but that she did not know he had kept the video of

1    himself doing that which revealed still the original

2    pornographic images.

3            Minor victim number three relating to Count 3 is a

4    14-year-old girl and she communicated with the defendant when he

5    was 18 and then 19 years old.  Minor victim number three

6    reported that the defendant took her virginity in September

7    2018 --

8            THE COURT:  Excuse me.  I thought you said at the

9    outset that minor victim three was 13.

10           MS. SCHNEIDER:  No, that was a background -- that was

11   background into how these investigations started.  That case is

12   not yet charged, the 13-year-old.

13           THE COURT:  So the June of 2018 reference between

14   defendant and a 13-year-old is a separate situation altogether?

15           THE DEFENDANT:  Yes.

16           THE COURT:  All right.  Thank you.

17           MS. SCHNEIDER:  So number three is a 14-year-old girl

18   who communicated with defendant when he was 18 to 19 while she

19   was at her house in Davenport with a friend.  The friend was

20   talking and communicating with the defendant on a cell phone.

21   She -- that minor victim number three joined the conversation.

22   She said the three of them were having sexual conversations and

23   sexual jokes, but that she never expected or wanted anything to

24   happen sexually.  Minor victim number three said that the

25   defendant was talking about wanting to have sex with her friend

1   until they were FaceTiming and he saw minor victim number three,

2   at which point the defendant said he wanted to have sex with

3   her.

4        Minor victim number three's friend then invited the

5   defendant over to minor victim number three's home without

6   telling the victim and without her knowledge or consent.  She

7   learned that the defendant was on his way over when he was

8   already on his way and she said that her friend told her that

9   she had to have sex with him and when he got there she reports

10  that she felt like she had no choice.  When the defendant

11  arrived they went into her bedroom and had sex.  After having

12  sex the defendant left, but continued to communicate with her

13  and asked her to be his girlfriend which she turned down.

14       She also saw the defendant socially in groups and

15  reported that the defendant was offering to buy her friends

16  things such as tobacco-related products since they were not old

17  enough to buy in order for him to have sex with her friends, but

18  she does not know or think that that ever happened.

19       After September 2018 minor victim number three had sex

20  one other time with the defendant, she estimates in April of

21  2019 when the defendant was 19, but she was still 14.  She

22  reported that she sent the defendant nude images of herself

23  because the defendant was again directly asking her to send

24  images and that if she ever said no, the defendant begged her

25  until she did.  No images of her were able to be identified as

1   not all of the images have people's faces.

2          There were also two other girls through the course of

3   this investigation that admitted sending sexually explicit

4   images and videos to the defendant as a result of his request.

5          The first is a 16-year-old girl who communicated with

6   defendant when he was 18.  She said that they were just friends,

7   but the defendant was trying to have sex with her and asked her

8   to send nude photos.  She admitted sending images of her

9   buttocks to the defendant and those were identified.  There are

10  also sexually explicit messages from the defendant to this girl

11  on the defendant's Snapchat account.  The girl reported feeling

12  like defendant was very demanding and that she had to do the

13  things that he was asking because he was pushy and she was

14  afraid of what the defendant would do if she did not comply.

15         The second -- the second girl is a 15-year-old girl

16  who communicated with the defendant when he was 18.  They first

17  met in February 2018 and that the defendant began coming on to

18  her within one week of meeting him.  She said she heard rumors

19  about the defendant and that he would beg and beg and beg until

20  he got what he wanted.

21         On their first encounter the defendant took her out of

22  school and took her to a park.  While in the car the defendant

23  pressured her for a kiss which moved into the defendant asking

24  her to perform oral sex on him which she refused.  The defendant

25  then continued touching her even though she was pushing him

1   away.   The defendant digitally penetrated her without her

2   consent.   She said she felt like she had no way out.

3          The girl reported that she communicated with the

4   defendant on Snapchat and Facebook Messenger and that's where he

5   would request nude images and videos of her.   Again, she

6   refused, but defendant would get upset and guilt her so she

7   complied.   The girl told the defendant she would not have sex

8   with him which defendant then told other kids at school causing

9   her emotional distress.   She thought if she had sex with him he

10  would leave her alone so the defendant brought her to his

11  parents' home before school one day in May 2018 and they had

12  sex.

13         The victims have reported harassment and intimidation,

14  both before the defendant moved away and after.   Some of the

15  harassment has occurred with the defendant present and some by

16  defendant's friends without him present.   The victims are in

17  fear for their safety.

18         Additionally, through these investigations, Detective

19  Johnson learned that the defendant's nickname is the Freshman

20  Slayer.   Many, if not most of the girls interviewed, knew

21  defendant by that nickname or had heard others refer to him as

22  such.

23         Detective Johnson obtained a search warrant for

24  defendant's Facebook account prior to Indictment; however, the

25  results of that were not received until after Indictment.   That

1  -- in the defendant's Facebook Detective Johnson located a

2  conversation in May of 2019 between defendant and a female

3  asking the female what happens to a female's nipples when

4  they're pregnant.  That female responded and defendant sent the

5  female two images depicting female breasts, stating that the

6  girl is 16 years old and used to live in Davenport, but now

7  lives in Clinton.  Based on all of that information, it is

8  believed that the defendant sent images depicting minor victim

9  number one's breasts to this other female on Facebook.

10        In addition, in October 2019 the defendant started

11  messaging yet another 16-year-old girl who lives in Iowa, even

12  though by this time the defendant had moved out of state.  The

13  defendant requested that the girl send him nude images,

14  including specific requests of her whole body and specifically

15  her vagina.  This conversation lasted from October 2019 until

16  February 27, 2020, with the same content, the defendant

17  requesting nude images and engaging in video chats.

18        THE COURT:  Mr. Parrish, do you have cross-examination

19  of Detective Johnson?

20        MR. PARRISH:  I do, Your Honor.

21        THE COURT:  Okay.  I am going to -- Detective Johnson,

22  I will have you take the witness stand.  Mr. Combs will be able

23  to see you much better if you are there and I am just going to

24  ask if we can have the video turned over to Mr. Parrish as well.

25  You can take your seat.  Okay.  Mr. Parrish is in one of the

1  video screens.  We only have three cameras.

2          Detective Johnson, would you raise your hand so Mr.

3  Combs will be sure to know who you are.  Okay.  You will raise

4  your hand now to take your oath from our clerk too.

5          SEAN JOHNSON, GOVERNMENT'S WITNESS, SWORN

6          THE COURT:  One minute before we go.

7          Mr. Combs, can you see and do you know who everyone is

8  who I just pointed out right now?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Okay.  And, Detective and Mr. Parrish, the

11  tendency for the two of you is to turn to face each other so

12  just make sure you keep your mics close as well.

13          MR. PARRISH:  Thank you, Judge.

14          THE COURT:  Thank you.  You may proceed.

15          MR. PARRISH:  Thank you, Your Honor.

16                          CROSS-EXAMINATION

17  BY MR. PARRISH:

18  Q.  State your full name, spell both your first and last name.

19  A.  Sean, S-e-a-n, Johnson, J-o-h-n-s-o-n.

20  Q.  And you are a detective for the Davenport Police Department?

21  A.  Correct, yes.

22  Q.  How long have you been in that department?

23  A.  I've been a detective for approximately three years.

24  Q.  Are you assigned to the sexual assault section?

25  A.  At the time of this investigation, yes, I was.

1  Q.  And that was -- when were you assigned?

2  A.  I first came up to the Detective Bureau in October of 2017.

3  Q.  And you first interviewed Mr. Combs in -- what, about a week

4  after he graduated from high school, is that correct?

5  A.  My first interview with Mr. Combs was not until January of

6  2019.

7  Q.  So who was working on the case before that?

8  A.  Detective Douglas.

9  Q.  And where is Detective Douglas?

10  A.  He is now a sergeant in our patrol unit.

11  Q.  So did you rely on any notes prepared by Detective Douglas

12  for your work in this case?

13  A.  I reviewed his cases, the previous cases of his; but I don't

14  think Detective Douglas assisted me in any of the child

15  pornography investigation.

16  Q.  So you started in 2019.

17       MR. PARRISH:  Judge, at this point we are going to ask

18  that all proffer testimony by the Assistant related to Mr.

19  Douglas and before Mr. Johnson came into this case be excluded

20  and not considered by the Court.  His notes have not been

21  provided to me, number one.  Mr. Douglas has not been provided,

22  he is not available for cross-examination, unless he is in the

23  hallway, and that was the proffer that she made, so we ask that

24  it be excluded until he's available for cross-examination.

25       THE COURT:  Mr. Parrish, I don't know if you laid the

1  appropriate foundation yet for what you are asking for.  You had

2  a couple questions, I don't know if this witness has testified

3  yet that there are reports that he's reviewed or relied on or

4  anything of that nature.

5          MR. PARRISH:  Right.  It is the proffer made by the

6  government that I am asking to be excluded as relates to Mr.

7  Douglas.  That would be reports dating back to 2018 since he did

8  not start working the case until 2019.

9          THE COURT:  Mr. Parrish, you haven't shown a

10 foundation yet to make that request.

11         MR. PARRISH:  Thank you.

12 Q.  So you --

13         THE COURT:  At this time it is denied.

14         MR. PARRISH:  That's fine.

15 Q.  You started working the case in 2019, is that correct?

16 A.  That's the first child pornography case.  I also worked

17 another case involving him in 2018 that was in November.

18 Q.  Which victim was that?

19 A.  It is not a victim that has been charged.

20 Q.  All right.  So no proffer that was made by the government

21 relates to that victim that you worked on, is that correct?

22 A.  Correct.

23 Q.  All right.  So you didn't work on the case that charges

24 victim number one, is that right, from 2018?

25 A.  2018?  Yes, that was my case.

1        THE COURT:  Excuse me.  Slow down, please.  You guys

2  are talking on top of each other.

3        Mr. Parrish, I'm confused by your questions and some

4  of the answers in terms of dates and things of that nature.

5        MR. PARRISH:  Why don't I do it differently, Judge.

6  Let me try a different approach here.

7  Q.  Let me go back to June of 2018.

8        Were you involved in that investigation?  Yes or no.

9  A.  I assisted with the search warrant at Mr. Combs' residence,

10  yes.

11  Q.  So June '18 you went out to his house to execute that search

12  warrant on the telephone, is that correct?

13  A.  No, that was the search warrant at his residence to obtain

14  the cell phone and the blanket.

15  Q.  So that was the second time, not the first time?

16        The first time was June 4th, is that right?

17  A.  On June 4th is when the initial report was received.

18  Q.  Right.  So did you talk to Mr. Combs with regard to the June

19  4th incident?  Yes or no.

20  A.  I was at the house for the search warrant relating to the

21  June 4th incident, yes.

22  Q.  Did you take him down to the police station that day?

23  A.  I personally did not.

24  Q.  Who took him down?

25  A.  Detective Douglas.

1  Q.  And did you participate in that interview at all?

2  A.  No, I did not.

3  Q.  He was there for approximately two hours, is that correct?

4  A.  I have no idea.

5  Q.  Okay.  So you knew nothing about that interview, didn't

6  participate in any way with that interview on June 4th, is that

7  correct?

8  A.  I reviewed the reports.

9  Q.  Right.  I have got it, but you did not participate in the

10  interview, is that correct?

11  A.  Correct.

12  Q.  All right.  There was another search warrant issued about a

13  month or two later, is that correct?

14  A.  I'm unsure of that.  It wasn't done by myself.

15  Q.  So after that search warrant that you said you participated

16  in, when was the next time you participated in any investigation

17  involving Mr. Combs?  Would you give us that date, please?

18  A.  It would have been in November of 2018.

19  Q.  And 2018 when you became involved, that related to victim

20  number what?

21  A.  That victim is not charged in this Indictment.

22  Q.  All right.  So after that one, when was the next time you

23  were involved?

24  A.  It would have been the May 2019 case, his next case involved

25  with this.

1  Q.  And which victim is that one?

2  A.  That person was not -- isn't involved in the Indictment

3  either.

4  Q.  So no charges with the November 2018 date, no charges with

5  the next one after that that you were involved in, is that

6  correct?

7  A.  This Indictment stems from the May 2019 case.

8  Q.  I got it.  So the first two the answer is you were not

9  involved, is that correct?

10         MS. SCHNEIDER:  Your Honor, I am going to object.

11         THE COURT:  Go ahead.  Finish your objection.

12         MS. SCHNEIDER:  These are confusing questions.

13         THE COURT:  The objection is overruled.

14         Mr. Parrish, the point is well taken.  When you say

15  the first two, I think the way you started off with June of

16  2018, November of 2018, May of 2019, that helps I think

17  everybody keep track.

18         MR. PARRISH:  Thank you.

19  Q.  Now, let's go to the next time that you were involved,

20  Detective Johnson.

21         When was that?

22  A.  The May 2019 case that has been the ongoing case since.

23  Q.  The May 2019 case, that's the case that you got involved

24  with, is that correct?

25  A.  I was involved, like I said, in the November 2018 case, that

1   was my case as well.

2   Q.   You told us that.   Right.   Let's go --

3   A.   You are saying that -- okay.

4   Q.   Let's go to the May 2019 case.

5            Were you involved in that?   Yes or no.

6   A.   Yes, I was.

7   Q.   What victim does that relate to?

8   A.   Minor victim one, two, and three came from that case.

9   Q.   Came from the May 2019 investigation?

10  A.   Through that investigation, the Indictment of minor victim

11  one, two, and three are stemming from that case.

12  Q.   Okay.   No charges were filed in State Court with regard to

13  any of the sexual abuse allegations, isn't that correct, against

14  Mr. Combs?

15  A.   That is correct, because of the --

16  Q.   I didn't ask you why.   No charges were filed in State Court

17  by the State of Iowa against Mr. Combs?   Yes or no.

18  A.   That's correct.

19  Q.   Okay.   Are any charges pending on those state sexual assault

20  cases in Scott County or Clinton County?   Yes or no.

21  A.   No, because we want --

22  Q.   No, I didn't ask you why.   Yes or no.

23  A.   No.

24  Q.   Okay.   Have reports been provided to the Scott County

25  Attorney's Office or Clinton County Attorney's Office with

1  regard to the sexual abuse allegations of either victim one,

2  victim two, or victim three?  Yes or no.

3  A.  I can't answer that.  I don't know if Detective Douglas did

4  or not.

5  Q.  You haven't?

6  A.  I have conferred with them, yes.

7  Q.  I asked you have you provided reports to them?  Not

8  conferred with them.

9        My question is did you provide reports to them?  Yes

10  or no.

11  A.  No.

12  Q.  Now, let's turn your attention to victim one.

13        Tell us the date, other than May of 2019, that you

14  became involved with victim one.

15  A.  It would have been the first interview I had with her in

16  June of 2019.

17  Q.  All right.  No other times before that, is that correct?

18  A.  No.

19  Q.  All right.  Tell us now, I want to skip forward, follow me

20  for a second, when was the last time that victim one said she

21  had any contact with Mr. Combs, last contact with Mr. Combs?

22        MS. SCHNEIDER:  Objection.  Relevance.

23        THE COURT:  Overruled.

24        THE WITNESS:  It would have been I believe in May of

25  2019.

1  BY MR. PARRISH:

2  Q.  Let's go to victim two.

3  A.  Okay.

4  Q.  Victim two, tell us the last time she has had any contact

5  with Mr. Combs.

6  A.  She said her relationship was the month of March in 2019.

7  Q.  Let's go to victim three.

8       When is the last time she said she had any contact

9  with Mr. Combs?

10  A.  April of 2019.

11  Q.  Have you tried to substantiate that by Facebook, by

12  Snapchat, by any other system such as tracking his phone number

13  to see have there been any other contact with either of these

14  three, victim one, victim two, or victim three?

15       Did you try to verify that?  Yes or no.

16  A.  Yes.

17  Q.  Did you verify that they were accurate?

18  A.  Yes.

19  Q.  Now I want to go -- Mr. Combs went to West High School, is

20  that correct?

21  A.  Correct.

22  Q.  I am not asking for any of these young ladies' names, but

23  did any of them, victim one, victim two, or victim three go to

24  the same high school that he did?

25       MS. SCHNEIDER:  Objection.  Relevance.

1          MR. PARRISH:  I am not asking what their names are.

2          THE COURT:  Hold on.  There's an objection pending.

3  Hold on.  Overruled.

4          THE WITNESS:  Can you repeat the question, Mr.

5  Parrish?

6  BY MR. PARRISH:

7  Q.  Did any of these young ladies, victim one, victim two, or

8  victim three, go to West High School with Mr. Combs?  Yes or no.

9  A.  Not to my knowledge, no.

10  Q.  Did you check and try to verify it?

11  A.  Yes.

12  Q.  And none of them went to West High, is that your testimony?

13  A.  That's what I believe at the time, yes.

14  Q.  What do you mean "you believe at the time"?

15  A.  One of them went to a different Davenport school, actually

16  all three of them went to a different Davenport school and one

17  of them doesn't live in the area.

18  Q.  Of the three, victim one, victim two, victim three, did they

19  know each other?  Yes or no?

20  A.  No.

21  Q.  And of the other people mentioned in the proffer, did you

22  meet with any of them?

23  A.  Yes.

24  Q.  Did any of them know each other?

25  A.  They said they had common knowledge of the names, but not

1  personally.

2  Q.  Personally they didn't know each other --

3  A.  Their proffer --

4       THE COURT:  Hold on.  Hold on.  Please, Detective and

5  Mr. Parrish, be respectful of not talking on top of each other.

6  It is difficult enough for our reporter to report; and Mr.

7  Combs, I want to make sure he has it clearly so, Mr. Parrish,

8  please restate your question.

9       MR. PARRISH:  Thank you, Judge.

10 Q.  Are you telling me that none of these young ladies knew each

11 other by telephone, by Snapchat, by Facebook, or by group texts,

12 is that your testimony as you sit here today?

13 A.  It is possible, Mr. Parrish.

14 Q.  Well, anything is possible.  Did you check it out?

15 A.  I had conversations with the juveniles, yes.

16 Q.  But did you verify by pulling up their Facebook accounts,

17 their group text account, their telephone accounts, or by going

18 through their Snapchat accounts to see did they talk with each

19 other?  Yes or no.

20 A.  No, I did not.

21 Q.  Now, couple other things.

22       Did either of these young ladies, I only had a quick

23 chance to go through the reports that were sent to me before the

24 hearing and I am not complaining about that, but my question for

25 you with regard to these young ladies, did either of them

1   indicate to you that they represented themselves to be older

2   than what they were?  Yes or no.

3          THE COURT:  I am going to interrupt.  Again, you have

4   to be specific.  You said either of these young ladies, we are

5   talking about more than two.

6   BY MR. PARRISH:

7   Q.  Either victim one, victim two, or victim three represent

8   that -- to Mr. Combs that they were older than their stated age?

9   Yes or no.

10  A.  Not that I recall.

11  Q.  You are saying you don't know?

12  A.  I'm saying that I would have to refer back to my reports.

13  Right now I do not know.

14  Q.  Well, it looks like in one of the reports one said they were

15  17 and they weren't actually 17.

16  A.  Or you could have misread that when Mr. Combs said he was 17

17  when he wasn't.

18  Q.  I have read what Mr. Combs said.  I asked you about the

19  girls.

20  A.  Again, right now at this moment I do not recall.

21  Q.  So it is possible, as you indicate, that during the

22  conversations between these people on Snapchat or Facebook or

23  some other method that they communicated, one or the other could

24  have indicated they were older than what they -- their stated

25  age, is that correct?

1   A.   Anything is possible.

2   Q.   Okay.

3        THE COURT:  Counsel and Detective, again, you guys are

4   turning away from microphones, it makes a difference, there's a

5   lot of background ambient noise.

6        MR. PARRISH:  Thank you, Judge.

7   Q.   At this point is it correct that for either victim one,

8   victim two, or victim three you did not get all of their

9   Snapchats because a parent erased them?

10  A.   No.

11  Q.   So no parent -- let me ask you this then:

12       Victim one, did you get all of her Snapchats with

13  regard to victim one?  Yes or no.

14  A.   Can you define "all"?

15  Q.   I don't have any way to define "all" other than all.

16  A.   Are you talking about all of her conversations with Mr.

17  Combs or all of her Snapchats with regard to everybody?

18  Q.   With regard to everybody, did you subpoena her Snapchat

19  account and get copies of everything?  Yes or no.

20  A.   Yes.

21  Q.   Every conversation that she had on Snapchat, throughout the

22  time she had the account, your testimony is that you have

23  obtained all of her Snapchat accounts, is that correct?

24  A.   If Snapchat answered the search warrant per request, then

25  yes.

1  Q.   Have you reviewed them?

2  A.   Yes.

3  Q.   And in her Snapchat when was the last date she communicated

4  with Mr. Combs?  In her Snapchat, not talking about the April

5  2019 date.

6  A.   If I remember correctly, there was a time in June of 2019

7  where there was like a one-sentence message to him.

8  Q.   She sent the message?

9  A.   I don't recall that.

10  Q.   Okay.   Let's go to victim number two.

11         Did you copy and receive by search warrant all of the

12  Snapchats related to victim number two?

13  A.   No.

14  Q.   So you have no idea the last time she communicated through

15  her Snapchat with Mr. Combs, is that correct?

16  A.   Just based on her word, due to my knowledge of how Snapchat

17  works.

18  Q.   Did you subpoena her Snapchat accounts?

19  A.   No.

20  Q.   Let's go to victim number three.

21         Did you subpoena all of victim three's Snapchat

22  accounts?  Yes or no.

23  A.   No.

24  Q.   So you don't have access to all the Snapchat accounts that

25  she communicated with Mr. Combs through, is that correct?

1   A.   Correct.

2   Q.   Outside of these people and the other people that were in

3   the proffer, I am not talking about victim one, victim two,

4   victim three, have you subpoenaed all of their Snapchat

5   accounts?  Yes or no.

6   A.   No.

7   Q.   Turning to Mr. Combs, did you know he had moved from Iowa?

8   A.   In a roundabout way, yes.

9   Q.   How did you find that out in a roundabout way?

10  A.   He changed his Facebook profile to where he was living.

11  Q.   Did he put his address on it?

12  A.   No.

13  Q.   What did he put on it to identify that he had moved?

14  A.   That he was living in I think it said Jacksonville, Florida,

15  which isn't where he was living.

16  Q.   How did you find his address of where he was living?

17          MS. SCHNEIDER:  Objection.  Assumes facts not in

18  evidence.

19          THE COURT:  Overruled.  The witness can answer, if he

20  knows.

21          THE WITNESS:  Open source media.

22  BY MR. PARRISH:

23  Q.   And what is open source media?

24  A.   Google.

25  Q.   Did you find his address or his father's address?

```
 1  A.  His father's.

 2  Q.  Did you find out the date he left Iowa?

 3  A.  No.

 4  Q.  Did find out where he was working?

 5  A.  No.

 6  Q.  Did you try to find out where he was working?

 7  A.  No.

 8  Q.  Did you go back to Arby's and see whether or not Arby's had

 9  referred him to a job in Georgia?

10  A.  No.

11  Q.  Now, did minor victim one have a Facebook account?

12  A.  I don't recall.  I never looked.

13  Q.  Did you get the birth certificate of minor victim one?

14  A.  No.

15  Q.  Did you get her school records?

16  A.  No.

17  Q.  Did you get her driver's license record?

18  A.  No.

19  Q.  How did you confirm how old minor victim one was?

20  A.  Her mom told me her date of birth, she told me her date of

21  birth.

22  Q.  And that's it?

23  A.  Yeah.

24  Q.  What about minor victim two?

25          Did you get her birth certificate?
```

1   A.   No, but I have her school records.

2   Q.   You did get her school records?

3   A.   She's in Davenport.

4   Q.   And what year was she born?

5   A.   I don't know right offhand.

6   Q.   How old is she now?

7   A.   She would be 17 now.

8   Q.   And how old was she when she said she sent photographs to

9   Mr. Combs?

10   A.   16.

11   Q.   Did you see any notes or did she indicate that he imposed

12   any physical violence on her to get the photographs?

13   A.   No.

14   Q.   Did you -- maybe I asked, did you pull her Facebook account?

15   Yes or no.

16   A.   Minor victim two?

17   Q.   Yes, sir.

18   A.   No, I did not.

19   Q.   Did you subpoena her cell phone records?

20   A.   No, I did not.

21   Q.   Who is her cell phone provider?

22        MS. SCHNEIDER:   Objection.   Relevance.

23   BY MR. PARRISH:

24   Q.   If you know.

25   A.   I don't know, sir.

1  Q.  Let's go to minor victim three.

2          Did you pull her --

3          THE COURT:  Hold on.  The question was answered before

4  I had a chance to rule.

5          Detective, you have to listen, but it is overruled.

6  It has been answered.

7  BY MR. PARRISH:

8  Q.  Minor victim number three, did you get her Facebook account?

9  A.  No.

10  Q.  Did you verify her date of birth?

11  A.  Yes.

12  Q.  How?

13  A.  School records.

14  Q.  And where are her school records?   Did you turn them in to

15  the government?

16  A.  Her information was in our local system so it is -- it was

17  placed into a report.

18  Q.  So it would be in the reports I have that was just given to

19  me?

20  A.  Yeah, but they're all redacted.

21  Q.  Her birth date would be redacted?

22  A.  I guess I can't comment on that because I didn't see the

23  redactions.

24  Q.  How old was she?

25  A.  She was 14.

1   Q.   How old is she now?

2   A.   She would be 15 now.

3   Q.   Did you subpoena her cell phone records?

4   A.   No.

5   Q.   So you don't know if she sent those phone records or not --

6   those phone photos or not?

7   A.   No.

8   Q.   And I think I may have asked you, I believe you indicated

9   you did not subpoena her Facebook account?

10   A.   No.

11   Q.   Okay.  Had she deleted material from her phone?

12   A.   Not that I am aware of.

13   Q.   Who deleted material from their phone?

14   A.   That was a parent of a victim that is not in this

15   Indictment.

16   Q.   Gotcha.  To your knowledge with regard to victim one, victim

17   two, victim three, did you find anything on their cell phone

18   records, anything on their Facebook account, anything on their

19   Snapchat to indicate since June of 2019 that Mr. Combs has been

20   in touch with them?  Yes or no.

21   A.   I haven't gotten the records since June of 2019 so I can't

22   answer that question.

23   Q.   Okay.  Did you know where Mr. Combs' father was employed

24   when he was here?

25   A.   Yes.

1    Q.  Where?

2    A.  The Arsenal.

3    Q.  Where was his stepmother employed?

4    A.  I couldn't tell you.

5    Q.  And where was Mr. -- you said you went to Arby's one day to

6    talk with him about his cell phone.

7            Was he employed at Arby's when you went there?

8    A.  Yes.

9    Q.  Did you know how long he had been employed there?

10   A.  No.

11   Q.  Throughout the time that you talked with him and Mr.

12   Douglas, I believe Officer Douglas talked to him, did he in any

13   way secrete himself, hide, try to get away, run, anything like

14   that throughout the entire time that this investigation was

15   going on to your knowledge?

16   A.  He moved to Georgia and didn't tell anybody.

17   Q.  Did you tell him to call you if he moved to Georgia?

18   A.  No, but he knew he had four pending investigations.

19            MR. PARRISH:  Nothing further.

20            THE COURT:  Redirect?

21            MS. SCHNEIDER:  Thank you, Your Honor.

22            May I stand, Your Honor, so I can see?

23            THE COURT:  Sure.  Move your mic up, please.

24            MS. SCHNEIDER:  Thank you.

25            THE COURT:  If anybody veers from their mic, I am

1   going to remind them about it.

2                                   REDIRECT EXAMINATION

3   BY MS. SCHNEIDER:

4   Q.  Detective Johnson, have you been involved in investigations

5   in one way or another of this defendant since June of 2019?

6   A.  2019 or 2018?

7   Q.  '18.  Thank you.

8   A.  Yes.

9   Q.  And did you review Detective Douglas' reports throughout

10  various times during your investigations?

11  A.  Yes.

12  Q.  So there was a report made in June of 2018?

13  A.  Correct.

14  Q.  Detective Douglas was the lead investigator on that?

15  A.  Correct.

16  Q.  And then there was a report in November of -- or it was

17  reported in early December of 2018?

18  A.  Yes.

19  Q.  You were the lead investigator on that?

20  A.  Yes.

21  Q.  And then there was a report in May of 2019?

22  A.  Correct.

23  Q.  These were three distinct investigations?

24  A.  Yes.

25  Q.  All of the charges in the Indictment stem from your

1   investigation of May of 2018, is that correct?

2           MR. PARRISH:  Object.  I think it is 2019.

3           MS. SCHNEIDER:  Am I saying the wrong date?

4           MR. PARRISH:  I think so.

5   BY MS. SCHNEIDER:

6   Q.  May 2019.

7   A.  Yes.

8   Q.  Thank you.

9           Detective Johnson, why were state charges not filed

10  regarding the June of 2018 sexual assault investigation?

11          MR. PARRISH:  Objection.  It is irrelevant, Judge, but

12  there's -- the issue for detention is whether or not charges

13  were filed, not why.

14          THE COURT:  Overruled.

15          THE WITNESS:  Charges were not filed due to the time

16  delay in receiving the DNA report back from the DCI lab.  I

17  believe at that time when he got those, this case had already

18  been discussed with the Assistant United States Attorney's

19  Office and was going to be accepted for prosecution with them.

20  BY MS. SCHNEIDER:

21  Q.  Because, in fact, as stated in the proffer, you did not get

22  those DNA results until June 27th of 2019, is that correct?

23  A.  Correct.

24  Q.  And so this investigation had already begun?

25  A.  Correct.

1   Q.   Do you have any information through the course of your

2   investigation with the females spoken about in the proffer that

3   those females knew one another or communicated?

4   A.   No.

5   Q.   Do you recall whether minor victim one, two, or three

6   misrepresented their age?

7   A.   I do not recall.

8   Q.   Why did you not obtain victim number two and three, their

9   Snapchat accounts?

10  A.   They had blocked the -- Mr. Combs from that account so

11  therefore my working knowledge of Snapchat, those messages and

12  snaps would not be available via search warrant.

13  Q.   So would you have had probable cause to believe that that

14  evidence existed at Snapchat?

15  A.   No.

16          MS. SCHNEIDER:   Nothing further.

17          THE COURT:   Anything else, Mr. Parrish?

18          MR. PARRISH:   One question.

19                        RECROSS-EXAMINATION

20  BY MR. PARRISH:

21  Q.   What evidence did you have that they had blocked him from

22  Snapchat?

23  A.   Just based on their word.

24  Q.   You didn't check it out?

25  A.   No.

1         MR. PARRISH:  Nothing further.

2         THE COURT:  Anything else?

3         MS. SCHNEIDER:  No, Your Honor.  Thank you.

4         THE COURT:  Thank you, Detective.  You are excused.

5   You can step down.

6         Ms. Schneider, do you have further witnesses?

7         MS. SCHNEIDER:  No, Your Honor.  The government rests.

8         THE COURT:  All right.  Mr. Parrish, what do you have

9   for evidence today and also witness testimony?

10        MR. PARRISH:  Judge, I have two witnesses -- I am

11  going to stay seated so he can see me.

12        I have Mr. Combs' mother and father, they would

13  testify pretty consistent, Judge, with the information that I

14  have in the pleading.

15        THE COURT:  They are by phone, right?

16        MR. PARRISH:  Correct, Your Honor.

17        THE COURT:  Just those two witnesses?

18        MR. PARRISH:  And I have one live witness, Judge, who

19  is out, but that falls into my alternative thought for the Court

20  so if you want her first, I can bring her in and she can go.

21        THE COURT:  Your case.  However you want to proceed.

22        MR. PARRISH:  Thank you, Judge.

23        Let me get her.

24        THE COURT:  Who is this witness?

25        MR. PARRISH:  Her name is Leslie Smith.

1          THE COURT:  Leslie Smith?

2          MR. PARRISH:  Yes, Judge.

3          I would want to make one quick proffer after she

4   testifies, Judge.

5          THE COURT:  Ms. Smith, please step forward.  Come

6   right down the middle so you can stay away from everybody and

7   the witness stand is right over there.  I am going to ask you to

8   walk right over there.  Do you see it?

9          Raise your right hand, please.

10          LESLIE SMITH, DEFENDANT'S WITNESS, SWORN

11          THE COURT:  Okay.  It is really important the court

12   reporter hears everything you say.  You have a face mask on too.

13   That's fine.  That helps; but please make sure you speak into

14   the mic.

15          THE WITNESS:  Sure.

16          THE COURT:  Your natural tendency is going to be to

17   turn to Mr. Parrish and that takes you away from the mic so

18   adjust it if you can.

19          Would you please start by stating and spell your first

20   and last names for our reporter?

21          THE WITNESS:  Leslie Smith, L-e-s-l-i-e, S-m-i-t-h.

22          THE COURT:  Can you lean closer to the mic?

23          THE WITNESS:  Sorry.

24          THE COURT:  Leslie Smith, is that correct?

25          THE WITNESS:  Yeah, L-e-s-l-i-e.

1          THE COURT:  I don't think your mic is on.

2          THE WITNESS:  There.  Leslie Smith, L-e-s-l-i-e,

3    S-m-i-t-h.

4          THE COURT:  Great.  If you can do that and turn to Mr.

5    Parrish.

6                    DIRECT EXAMINATION

7    BY MR. PARRISH:

8    Q.    Thank you, Ms. Smith, for coming today.  My questions are

9    going to be pretty brief.

10          You know LaMark Combs, is that correct?

11   A.   Yes.

12   Q.   What is your relationship with him?

13   A.   I am his aunt.

14   Q.   Okay.  Your sister is married to his father, is that

15   correct?

16   A.   Yes.

17   Q.   And they have been married how long?

18   A.   They've been married, oh, I will be married 20 years, 15

19   years, yeah.

20   Q.   Thank you.

21          And you have known LaMark since he was a baby?

22   A.   Oh, yes.

23   Q.   Tell us a little bit about yourself.

24          You would agree to be a third-party custodian for him

25   if he had to stay in Davenport, is that correct?

1  A.   Yes.   Yes.

2  Q.   Tell me a little bit about yourself.

3        Where are you employed?

4  A.   I work at Genesis Medical Center, I have been there for -- I

5  just passed -- well, it will be 20 and a half years.   I just

6  passed my 20 years.

7        I hold two part-time jobs, one is a contract

8  specialist and the other one is storeroom coordinator for the

9  materials department.

10 Q.   And you are continuing to work through COVID-19, is that

11 correct?

12 A.   Sure.   Absolutely.   Yes.

13 Q.   Give us your address, please.

14 A.   1344 North Lawn Road, Davenport, Iowa   52804.

15 Q.   How far is that from the courthouse?

16 A.   From the courthouse, probably a mile, mile and a half.

17 Q.   And you are married to?

18 A.   Steven Smith.

19 Q.   And tell us where Steven Smith works.

20 A.   Steve works for the Department -- he works for the Arsenal,

21 he is an HVAC tech at the Arsenal.

22 Q.   And right now he is at home not because he has COVID-19, but

23 because of COVID-19, is that correct?

24 A.   Right.   Right.

25 Q.   And how long has he worked there and just tell the Court

1  briefly what he does.

2  A.  He's been there for, oh, I'd say close to five years, five

3  years I believe, our he was at the hospital for quite a while

4  before he went there.

5          He works for JMTC and he does all the heating and air

6  conditioning issues at the Rock Island Arsenal.

7  Q.  And tell us briefly, you don't have children, do you?

8  A.  No.

9  Q.  And so would there be a room aside for LaMark where he could

10  stay?

11  A.  Oh, absolutely.  We have, yeah, two additional guest

12  bedrooms.

13  Q.  And if he was on a bracelet, let's assume that the Court

14  would order him to be placed on it pretrial, would you agree he

15  could stay in your home under those circumstances?

16  A.  Absolutely.

17  Q.  I have discussed the nature of the charges that he is

18  charged with, is that correct?

19  A.  Yes.

20  Q.  And you would still allow him to stay there?

21  A.  Absolutely.

22  Q.  Now, I asked you, did you have a home -- we call it land

23  line, most people don't have them.

24  A.  Right.

25  Q.  Would you be willing to install a land line if the Court or

1  the pretrial office ordered you to do so?

2  A.  Absolutely.

3  Q.  All right.

4  A.  Absolutely.

5  Q.  You know obviously where Mr. Combs, LaMark worked when he

6  was in town.

7          If he got a job, would you and your husband be home

8  enough where you could help monitor his stay at your house?

9  A.  Sure.  Yeah.  Absolutely.

10 Q.  If he had a problem and did not comply, did not comply with

11 a curfew or something like that, would you be willing to call

12 the Court to get him to do that?

13 A.  Sure.  Yeah.

14 Q.  All right.

15         MR. PARRISH:  No questions, Judge.

16         THE COURT:  Any questions?

17         MS. SCHNEIDER:  Thank you.

18                         CROSS-EXAMINATION

19 BY MS. SCHNEIDER:

20 Q.  Good afternoon, Ms. Smith.

21 A.  Good afternoon.

22 Q.  Have you been tested for COVID-19?

23 A.  I have not.

24 Q.  Has your husband been tested?

25 A.  He has not because he doesn't currently have symptoms.

1  Q.  Thank you.

2       Mr. Parrish asked you if you had children.

3       Do you have any other nieces or nephews or friends who

4  have minor children?

5  A.  I do.

6  Q.  Do they visit your home?

7  A.  On occasion.

8  Q.  What kind of electronics do you have in your home?

9  A.  My husband and I both have laptops that are way outdated,

10 but we have -- I have a cell phone and an iPad.

11 Q.  Do you have a Smart TV?

12 A.  We do, yeah.

13 Q.  Do you have any other Smart devices in your home?

14 A.  No, no.

15 Q.  Would you be willing to give up any of your electronic

16 devices or your Internet connection in order to have the

17 defendant live with you?

18 A.  Yeah.  Absolutely.

19 Q.  Would you or your husband be able to still work from home

20 without Internet right now?

21 A.  We don't work from home; but yeah, we could handle no

22 Internet.

23       MS. SCHNEIDER:  Thank you.  Nothing further.

24       THE COURT:  Mr. Parrish, anything else?

25       MR. PARRISH:  The only thing I would make, Judge, so

1   Ms. Smith can hear me, she basically said that her husband --

2           THE COURT:  Would you get to the microphone?

3           MR. PARRISH:  Steve also would agree to allow him to

4   be at home, he is at home right now, and this would be a proffer

5   that I would make, his testimony would be consistent with what

6   Leslie Smith stated and that he doesn't know when he is going to

7   go back yet on COVID-19; but he would be home during that time

8   and be willing to have LaMark live with him.  That's all, Judge.

9           THE COURT:  All right.  But no further questions for

10  Ms. Smith?

11          MR. PARRISH:  None, Your Honor.  No.

12          THE COURT:  Ms. Smith, thank you.  You are excused.

13          MR. PARRISH:  You can leave now if you need to go

14  home.  Thank you so much.

15          THE COURT:  Mr. Parrish, do you have additional

16  evidence?

17          MR. PARRISH:  I do, Judge, I have LaMark Combs and I

18  called Deb yesterday and gave her the number where we can reach

19  him, but I also have the number here to make the call to his

20  home.

21          THE COURT:  We will have our clerk do that.  That way

22  he can be on microphone and hear everybody.

23          MR. PARRISH:  That would be perfect.

24          MS. SCHNEIDER:  Your Honor, may I inquire if there is

25  going to be both witnesses called; and if so, if there's a

1   Sequestration Order that can be given to them, Your Honor.

2          MR. PARRISH:  I did, Judge.  I told them that that

3   could be possible, that the wife would have to step out of the

4   room, I alerted them to that so they are prepared for it, so if

5   you want her to step out and we will ask them when they are

6   there, okay.

7          THE COURT:  Mr. Combs is being called first?

8          MR. PARRISH:  Thank you.  That's perfect, Judge.

9          MR. LAMARK COMBS SENIOR:  This is Mr. Combs.

10          THE COURT:  Mr. Combs, this is United States

11   Magistrate Judge Stephen Jackson Junior here in the courthouse

12   in Davenport -- Federal Courthouse in Davenport, Iowa.

13          You are being called to testify by phone in a

14   detention hearing this afternoon for LaMark Combs Junior, is

15   that correct?

16          MR. LAMARK COMBS SENIOR:  Yes, Your Honor.

17          THE COURT:  All right.  Are you able to hear me loud

18   and clear?

19          MR. LAMARK COMBS SENIOR:  Yes, Your Honor.

20          THE COURT:  All right.  Just some rules of engagement

21   here, if at any time you can't hear something someone says,

22   please let us know.  I have made sure both attorneys are close

23   to their mics so that you can hear them.

24          Next, I am going to ask that -- I understand your

25   wife, Mrs. Combs, is going to testify as well and so she would

1  need to step out of the room that you are in and just make sure

2  the door is shut so that prior to her testimony, she does not

3  hear your testimony.

4         Can you take care of that right now?

5         MR. LAMARK COMBS SENIOR:  Yes, Your Honor.

6         THE COURT:  All right.  And is that done?

7         MR. LAMARK COMBS SENIOR:  Just one second.  I will

8  shut the door, Your Honor.  Yes, Your Honor.

9         THE COURT:  Okay.  Ms. Combs is out of the room now,

10 is that right?

11        MR. LAMARK COMBS SENIOR:  Yes, Your Honor.

12        THE COURT:  Okay.  The next thing is you are going to

13 receive an oath to tell the truth from our clerk right now.

14        THE WITNESS:  Yes, Your Honor.

15        LAMARK COMBS SENIOR, DEFENDANT'S WITNESS, SWORN

16        THE COURT:  All right.  Mr. Parrish, you may proceed

17 with questions.

18        MR. PARRISH:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20 BY MR. PARRISH:

21 Q.  State your name, spell both your first and last name for the

22 record, Mr. Combs.

23 A.  LaMark, L-a, cap M-a-r-k, Combs, C-o-m-b-s.

24 Q.  How old are you, sir?

25 A.  44 years old.

1  Q.  Tell us briefly, where were you born?

2  A.  I was born in St. Louis, Missouri, January 28, 1972.

3  Q.  And how long have you, in fact, lived in Iowa before you

4  moved to Georgia?

5  A.  We moved there approximately 13, 14 years old.  I don't know

6  how long that possibly is.

7  Q.  Tell us your education after high school.

8       Where did you go to school?

9  A.  After high school I attended Scott Community College.  While

10  I was there I received an Associate's Degree in general

11  education then I went on and got my undergrad from Western

12  Illinois University in law enforcement/justice administration,

13  then I went on and got a Master's in -- from Western Illinois as

14  well in law enforcement/justice administration and also I

15  completed a Master's from Concordia University of education and

16  I am now working on aG74 6

17   Master's in divinity.

18       THE COURT:  Mr. Combs, it is a little tough to hear

19  you, you know, all these cell phones and computers and different

20  technology sometimes sounds like you are talking inside of a can

21  a little bit and that is coming through so would you please make

22  sure you are speaking right into the microphone and speak up a

23  bit?

24       THE WITNESS:  Yes, Your Honor.

25       THE COURT:  Okay.  Keep doing that a little bit more

1 and that would be great.  Thanks.

2          THE WITNESS:  Yes, Your Honor.

3 BY MR. PARRISH:

4 Q.  You work now where?  Tell the Court where you work.

5 A.  I am currently working at the DOD, Department of Defense, in

6 Kingsland, Georgia, at the Naval base for the Department of the

7 Navy.

8 Q.  How long have you worked for them?

9 A.  I worked for them -- the Department of Defense or --

10 Department of Defense altogether I worked three and a half

11 years.

12 Q.  And before you worked in the current job that you have now,

13 where did you work?

14 A.  I worked for the Scott County Sheriff's Department.  Well,

15 for the Davenport School District and Scott County Sheriff's

16 Department also.

17 Q.  And what did you do for the Scott County Sheriff's

18 Department?

19 A.  I was a correction officer for seven and a half years.

20 Q.  And for the school district, what did you do?

21 A.  I was an instructor.  I was a para aide and then I was an

22 instructor there.

23 Q.  Did you also work at the Rock Island Arsenal?

24 A.  Yes, I worked at the Rock Island Arsenal, also the DOD, for

25 the Department of the Army.

1  Q.  And how long did you work for them?

2  A.  I was there two -- possibly two and a half years.

3  Q.  What was your address in Davenport, Iowa?

4  A.  My address was Six Hidden Valley Circle, Davenport, Iowa

5  52804.

6           THE COURT:  Can you repeat that, please, Mr. Combs?

7           THE WITNESS:  Davenport, Six Hidden Valley Circle,

8  Davenport, Iowa  52804.

9           THE COURT:  Thank you.

10  BY MR. PARRISH:

11  Q.  How long did you live at that address?

12  A.  I lived at that address probably 12 years.

13  Q.  And who are you married to?

14  A.  I'm married to Jacinta Combs.

15  Q.  How long have you all been married?

16  A.  Been married almost 15 years.

17  Q.  And how long have you had a relationship before that?

18  A.  About 20 years altogether.

19  Q.  And of the children that you had before you got married to

20  her, was LaMark one of those children?

21  A.  Yes.

22  Q.  Did she raise him since he was about 10 months old?

23  A.  Yes, Your Honor.

24  Q.  Okay.  Actually this is Al.

25  A.  Okay.

1  Q.  Yeah.  My next question is where did LaMark work since he

2  was 14?  Just briefly tell us where his employment has been.

3  A.  He worked for a corn detasseler in Davenport, Iowa; he

4  worked at Arby's in Davenport, Iowa; then he worked at Burger

5  King in Davenport, Iowa.

6  Q.  And when he left Iowa and moved to Georgia with your new

7  job, where did he start working there?

8  A.  He started working at Arby's right away.

9  Q.  Did he get a transfer from Arby's in Davenport to the Arby's

10  in Georgia?  How did that come about?

11  A.  He went there and let them know that he worked at the

12  Arby's, at the one in Davenport, and then they confirmed it and

13  they hired him.

14  Q.  And where did he live during that time once you guys moved

15  from Davenport to Georgia?

16  A.  We was in temporary housing on the base, Kings Bay Naval

17  Base.

18  Q.  And did he -- when I say he, LaMark Junior -- have to get

19  some type of identification in order to be on the base?

20  A.  Yes.

21  Q.  And is a copy of that marked as an exhibit that you reviewed

22  in the documents that we submitted to the Court?

23  A.  Yes.

24  Q.  And did he have to go through a background check in order to

25  get that?

1  A.  Yes.

2  Q.  And when did you move and when did he get that ID card for

3  the base?

4  A.  I don't recall the exact -- I moved in June, June 23rd I

5  moved to this area; but I don't know the exact date he received

6  his ID.

7  Q.  And when the background check was done, did anything turn up

8  of any significance about any charges or any investigation

9  pending in Iowa?

10  A.  No.

11  Q.  Okay.  Were you aware that officers had come out and talked

12  to him, not the content of what they did, of what he said to

13  you, were you aware that they had come to the house with a

14  search warrant?

15  A.  Yes.

16  Q.  Did the officers tell you, not what they told anyone else,

17  that if you moved to Georgia or Nebraska or anywhere, that you

18  were required to call them?

19  A.  No.

20  Q.  Okay.  Had you been told to call them before you moved,

21  would you have done that?

22  A.  Yes.

23  Q.  Tell me now that you are in Georgia, do you have a security

24  clearance from the Department of Defense?

25  A.  Yes.

1  Q.  How long have you had a security clearance with them?

2  A.  About two and a half years.

3  Q.  Is it considered a secret security clearance?

4  A.  Yes.

5  Q.  Does your wife also have one with them?

6  A.  Yes.

7  Q.  Is your address listed in the normal course of business as

8  the address of a home that you purchased with your family and

9  your daughter and your other son, is that address listed in your

10  name?

11  A.  Yes.

12  Q.  Since you have been in Georgia has LaMark had any difficulty

13  with the law or any law enforcement officials been to your house

14  to contact you other than the arrest of him by agents in

15  Georgia?

16  A.  No.

17  Q.  Okay.  Let me turn to another matter very briefly.

18      LaMark filled out a sheet or was interviewed by

19  pretrial in Georgia.

20      Were you present when he was interviewed by pretrial

21  in Georgia?

22  A.  No.

23  Q.  Did they call you afterward with regard to background

24  information on LaMark?

25  A.  Yes.

1  Q.  Did you provide them any information on any health issues

2  that he had?

3  A.  I don't recall.  I think I did.

4  Q.  Okay.  And it looks like there's some reference there.

5       Let me ask you then, explain briefly what medical

6  information you may have provided or that you knew about that

7  put LaMark in some jeopardy with regard to his health.

8  A.  He had a recent -- he was recently admitted into the

9  hospital for pancreatitis probably about a month before his

10  arrest.

11  Q.  And that's pancreatitis, is that correct?

12  A.  Yes, pancreatitis.

13  Q.  Can you tell us how many days before the arrest was he

14  admitted to the hospital for that?

15  A.  He was admitted -- it was Super Bowl -- it was Super Bowl

16  Sunday he was admitted, I remember that because the Super Bowl

17  was on, so I don't remember the exact date that was, but he was

18  in the hospital for a week and then the 11th when they made the

19  arrest.

20  Q.  And did you track him after you called me to assist you in

21  this matter from the time they arrested him in Georgia and then

22  they moved him to Florida, they moved him back to Georgia, and

23  then they moved him to Oklahoma, did you track him at that

24  point?

25  A.  Yes, I was trying to keep up with him, yes.

Q.  And did you find at some point when he was in Oklahoma,
Grady County, that he developed -- started developing a medical
condition?

A.  Yes.

Q.  And what did you, if anything, instruct me to do to assist,
what did you do and what did you tell LaMark to do with regard
to his medical condition?

A.  I told him to report it to the correctional facility.

Q.  And do you know how -- what he described as the type of pain
that he was experiencing?

A.  He was experiencing abdomen and back pain.

Q.  And did LaMark have a follow-up appointment on his medical
condition once he got out of the hospital after he had been in
there a week?

A.  Yes, he did.  He had a follow-up appointment which he missed
because he was arrested before he could go to the follow-up
appointment.

Q.  And did you explain that to anyone in the Marshals Office
that he had a medical appointment that was pretty important for
him to go to?

A.  I was not able to discuss that with the Marshals Department.

Q.  So other than requesting that I file certain Motions and
getting copies of the medical report and sending a letter to the
Grady County Correctional Facility, has anything else been done
to get LaMark in for his medical treatment?

1   A.   I think my wife wrote a letter to the marshals.

2   Q.   Okay.  All right.  But you did provide those medical records

3   to me related to his pancreatitis that he had with regard to

4   this matter, is that correct?

5   A.   Yes.

6   Q.   All right.  Have you followed up with the doctors to make

7   any inquiry as to how that condition might impact him?

8   A.   Not since we left the hospital.

9   Q.   Okay.  Did they express to you any importance of follow-up

10  medical that he might need to make sure he was going to be okay?

11  A.   Yes, they did stress to me the importance because they said

12  if he had another attack, they said it was going to take about

13  six months to heal if he was under the right medical treatment;

14  and if not, if it recurred, it could become acute pancreatitis

15  which could become fatal or very untreatable.

16  Q.   And you had expressed that to me early on when you had me

17  try to track him through the U.S. Marshals Office, is that

18  correct?

19  A.   Yes.

20  Q.   A couple other things I want to ask you about your

21  activities in Davenport.

22        You served as a part-time minister, a youth minister

23  at your church?

24  A.   Yes.

25  Q.   How long did you do that, Mr. Combs?

1  A.  For about seven years.

2  Q.  And the church you are in now in -- I know you can't attend

3  church, I don't know about Georgia, you can't -- some people

4  can't go to churches, but do you go online now or what do you do

5  for your programs?

6  A.  Yeah, my family and I, we sit in our family room and we

7  watch it on our television virtually.

8  Q.  And with regard to LaMark when he was down there, how often

9  did he go to church?

10  A.  Every Sunday.

11  Q.  And did he participate in any youth groups down there?

12  A.  Yes, he participated in a young adult group, ages from 18 to

13  35 every Tuesday.

14  Q.  Let's talk about your home a little bit.

15       You submitted some photographs for the Court.  I know

16  you submitted more for me than the ones that we actually

17  presented; but would LaMark have his own room if he was there?

18  A.  Yes, he has his own room.

19  Q.  Would you be able to provide him medical treatment if he was

20  there?

21  A.  Yes.

22  Q.  The other questions I would ask you, would he be able to go

23  back to his employment in Georgia at -- I know he -- he had

24  taken training as a forklift driver and been certified in that,

25  is that correct?

1  A.  Yes.

2  Q.  You had also taken him out where he was going to try to go

3  to school, but he couldn't get his -- he hadn't taken his ACT

4  exam, is that right?

5  A.  Yes.

6  Q.  So my question is could he get -- regain his employment at

7  Lowe's?  Were you aware of anything that would restrict him from

8  going back to Lowe's?

9          MS. SCHNEIDER:  Objection.  Outside the witness'

10  personal knowledge.

11          THE COURT:  Overruled.  You can answer.

12          THE WITNESS:  He was on good terms as far as I know.

13  BY MR. PARRISH:

14  Q.  All right.  And if that didn't work out, could he go back to

15  Arby's too?

16  A.  Yes, he left there on good terms.

17  Q.  At one point he was working both jobs, is that right?

18  A.  Yes.

19          MS. SCHNEIDER:  At this point, Your Honor, I am going

20  to ask -- objection to leading questions.

21          THE COURT:  In the interest of time, it is overruled;

22  but --

23          MR. PARRISH:  I am about ready to wrap up, Judge, too.

24  Q.  Let me just ask you a couple questions.

25          I did send you a copy of the Petition that I filed

1  with the Court for you to review concerning terms of release if

2  the Court would agree to them or the pretrial would agree to it,

3  is that correct?

4  A.  Yes.

5  Q.  You had a chance to review those, is that correct?

6  A.  Yes.

7  Q.  Do you have a home phone with a land line?

8  A.  Google Voice with a land line.

9  Q.  You would be willing to keep that in effect, is that

10  correct?

11  A.  Yes.

12  Q.  Would you agree to be a third-party custodian and report to

13  the Court or pretrial if LaMark had any problems when he was in

14  Florida -- in Georgia?

15  A.  Yes.

16  Q.  Would you impose a curfew on him if the Court were to

17  require that and make sure it was followed?

18  A.  Yes.

19  Q.  What about home confinement?  If the Court put him on home

20  confinement, he could only go out to work, would you agree that

21  after he came back, he had to stay at home and couldn't go out

22  around the neighborhood and may even be restricted from going to

23  church, would you agree to that?

24  A.  Yes.

25  Q.  I know you wouldn't be happy about it, but you would agree

1  to it, is that right?

2  A.  Yes.

3  Q.  What about his telephone?

4          Are your computers, and I know you filed a separate

5  statement, are your computers password protected?

6  A.  Yes.

7  Q.  Would you restrict him, if the Court told you he couldn't

8  use computers or have access to it, to restrict him to a basic

9  cell phone without any magical electronics on it or a

10  smartphone, would you be willing to do that?

11  A.  Yes.

12  Q.  Would you assist him in obtaining employment?

13  A.  Yes.

14  Q.  Although he has not indicated except for some alcohol when

15  he was 14 and said he's never been intoxicated, would you agree

16  with regard to substance abuse, if he needed an evaluation,

17  would get him in for an evaluation at the local facility or

18  could he go to the Navy facility for that?

19          Are you on insurance for that?

20  A.  Yes.

21  Q.  Okay.  He does qualify for your insurance plan?

22  A.  Yes.

23  Q.  Okay.  The last couple of questions I want to ask you is

24  about transportation.

25          You would prefer him to be home with you where you

1  could enforce these restrictions, is that correct?

2  A.  Yes.

3  Q.  Do you believe you have the experience, background, and

4  training and that LaMark would listen to you to impose those

5  restrictions on him and if he failed to, to alert the Court or

6  pretrial without any problems?

7  A.  Yes.

8  Q.  Finally, in terms of getting him home, and I know you and I

9  have had some issue in the transport, but are you and your

10  family able to fly him directly home or arrange for him to be

11  picked up and taken back down to Georgia to be able to be at

12  home with his family?

13         Are you able to do that?

14  A.  Yes.

15         MR. PARRISH:  Nothing further, Judge.

16         THE COURT:  Hold on.  Hold on.  Is there any

17  cross-examination?

18         MS. SCHNEIDER:  Yes.  Thank you.

19                    CROSS-EXAMINATION

20  BY MS. SCHNEIDER:

21  Q.  Mr. Combs, you knew of these police investigations at the

22  time you moved?

23  A.  Yes.

24  Q.  And how many phones were you aware that the law enforcement

25  had taken of the defendant's?

1  A.   Two.

2  Q.   So you knew that there were multiple occasions in which the

3  police were investigating the defendant?

4  A.   Yes.

5  Q.   Mr. Parrish asked you about the defendant getting an ID for

6  the Naval base down there.

7         That was prior to the Federal Indictment, is that

8  right?

9  A.   Yes.

10  Q.   You stated you had no knowledge of the defendant being

11  involved with law enforcement in Georgia.

12         Are you fully aware of the extent of the law

13  enforcement involvement in Iowa?

14  A.   No.

15  Q.   You filed an Affidavit with one of the previous Motions for

16  the defendant's release, is that right?

17  A.   Yes.

18  Q.   You understand that that Affidavit was filed and certified

19  under the penalty of perjury?

20  A.   Yes.

21  Q.   You are not now and never have been a certified peace

22  officer in Iowa?

23  A.   No, I was a correction officer.

24  Q.   I'm sorry?

25  A.   I was a correction officer.

1  Q.  Right.  And so you filed -- you said in your Affidavit that

2  you were actually a deputy with the Scott County Sheriff's

3  Department.

4          That is not true, is it?

5  A.  No, I was a correction officer.

6  Q.  And, in fact, you were fired from the Scott County Sheriff's

7  Department?

8  A.  Yes.

9  Q.  Have you been tested for COVID-19?

10 A.  No.

11 Q.  How many people currently reside in your home?

12 A.  Four.

13 Q.  That would be you, your wife, and who?

14 A.  My son and my daughter.

15 Q.  And that is in addition to the defendant?

16 A.  In addition to the defendant, it would be five all together.

17 Q.  Okay.  And to your knowledge has your wife been tested for

18 COVID?

19 A.  No.

20 Q.  Has your son been tested for COVID?

21 A.  No.

22 Q.  Has your daughter been tested for COVID?

23 A.  No.

24 Q.  So you do have the Internet at your home, right?

25 A.  Yes.

1  Q.  What electronic devices do you have in your home?

2  A.  I have three computers -- four computers.

3  Q.  Is that all of the devices in the home?

4  A.  Yes.

5  Q.  Do you have a Smart TV?

6  A.  Yes.

7  Q.  So would that be five?

8  A.  Yes.

9  Q.  Do you have any gaming systems that connect to the Internet?

10  A.  Yes.

11  Q.  How many?

12  A.  Two.

13  Q.  So seven electronic devices then?

14  A.  Yes.

15  Q.  And the defendant had -- prior to his arrest did he have

16  access to the Internet in your home?

17  A.  Yes.

18  Q.  So he knew the wi-fi password?

19  A.  Yes.

20  Q.  Did he have -- what electronic devices did he have?

21  A.  Phone, computer.

22  Q.  And then did he also have access to the TV and the gaming

23  devices?

24  A.  Yes.

25  Q.  What are the ages of the son and daughter that are currently

1   in your home?

2   A.  My son is 11, my daughter is 18.

3   Q.  And would you be willing to get rid of the electronic

4   devices or the Internet in your home in order to have the

5   defendant reside with you?

6   A.  As far as the Internet, I am working from home.

7   Q.  So is that a no?

8   A.  I could put strict passwords on them.

9   Q.  To your knowledge the medical report or discharge report

10  that you provided Mr. Parrish that he filed with the Court, that

11  is accurate, is that correct?

12  A.  Yes.

13          MS. SCHNEIDER:  Nothing further.

14          THE COURT:  Mr. Parrish, anything else?

15          MR. PARRISH:  A couple of questions, Judge.

16                          REDIRECT EXAMINATION

17  BY MR. PARRISH:

18  Q.  Have you, your wife, or 18-year-old daughter or 11-year-old

19  son shown any symptoms for COVID-19?

20  A.  No.

21  Q.  And your 18-year-old daughter who lives at home, I believe

22  she went to Clark College in Atlanta, is that part of the reason

23  that you all moved down there, is that correct?

24  A.  Yes.

25  Q.  And now is she studying from home?

1  A.  Yes.

2  Q.  On what?  Zoom or whatever; but she uses her computer,

3  right?

4  A.  Yes.

5  Q.  Would you be willing, as asked by Ms. Schneider in this

6  case, to put passwords on that would protect those passwords

7  where LaMark would not have access to them?

8  A.  Yes.

9  Q.  And you talked about your work, and this is my last

10  question, with regard to the Department of Defense.  Because of

11  COVID-19 you are working from home.

12          Do you have any idea how long that is going to be?

13  A.  No.

14  Q.  So you could put password protected items on the computers

15  that the Department of Defense provides to you, is that correct?

16  A.  Yes.

17  Q.  Is your preference that LaMark come home, even though

18  there's an alternative spot that we're asking to stay with his

19  family, would your preference be that he come to Georgia to live

20  with you and the family and prepare for his defense there?

21  A.  Yes.

22          MR. PARRISH:  Thank you.  I have nothing further.

23          THE COURT:  Anything else, Ms. Schneider?

24          MS. SCHNEIDER:  No, Your Honor.  Thank you.

25          THE COURT:  All right.  Mr. Combs, you are excused.

1          Are you calling Mrs. Combs?

2          MR. PARRISH:  She will be very brief, Judge, and I

3  realize she did not hear the conversation.

4          THE COURT:  Mr. Combs, please step out of the room and

5  put your wife on the phone.

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  Hello, Mrs. Combs?

8          MRS. JACNITA COMBS:  Yes.

9          THE COURT:  Hi.  I am Judge Jackson.

10          Are you -- is the door closed and no one is in the

11  room with you?

12          MRS. JACNITA COMBS:  Correct.

13          THE COURT:  I am going to have you receive an oath to

14  tell the truth from our clerk and then Mr. Parrish will ask you

15  some questions; but I just want to make sure that you know to

16  speak loudly and clearly so we can hear you.

17          MRS. JACNITA COMBS:  Yes, Your Honor.

18           JACNITA COMBS, DEFENDANT'S WITNESS, SWORN

19          THE COURT:  Please make sure you speak right into the

20  phone.

21          Mr. Parrish, you may proceed.

22          MR. PARRISH:  Thank you, Your Honor.

23                          DIRECT EXAMINATION

24  BY MR. PARRISH:

25  Q.  I won't have as many questions for you, Mrs. Combs, as I had

1  for Mr. Combs; but how old are you?

2  A.   42.

3  Q.   How long --

4              THE COURT:  Excuse me.

5              MR. PARRISH:  Oh, I'm sorry.

6              THE COURT:   Mrs. Combs, please state and spell your

7  first and last names for our reporter.

8              MR. PARRISH:  Sorry.

9              THE WITNESS:  Jacnita Combs, C-o-m-b-s.

10             THE COURT:  Your first name too.

11             THE WITNESS:  I'm sorry.  J-a-c-n-i-t-a.

12             THE COURT:  J-a-c-n-i-t-a?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Okay.  Thank you.

15  BY MR. PARRISH:

16  Q.   You said you are 42, is that correct, Ms. Combs?

17  A.   Yes.

18  Q.   You have known LaMark since he was 10 months old and you

19  raised him?

20  A.   Yes.

21  Q.   And you have two other kids who live in the home right now,

22  would that be your 11-year-old son and your 18-year-old daughter

23  who is home from Clark College taking her classes there, is that

24  correct?

25  A.   Correct.

1  Q.  All right.  LaMark, would he have his own room if he was

2  released to stay with you all?

3  A.  Yes.

4  Q.  Let me briefly ask you about your background.

5          Where did you graduate from college after high school?

6  A.  I went to Scott and got my Associate's Degree, two

7  Associate's Degrees, then I graduated from Western Illinois with

8  a Bachelor's, it's a Board of Trustees general degree, liberal

9  arts.

10  Q.  And your sister is Leslie Smith, is that correct?

11  A.  Correct.

12  Q.  And you are aware she has agreed to be a third-party

13  custodian if the Court does not allow LaMark to go out of Iowa

14  and back to Georgia to live with his family, is that correct?

15  A.  Correct.

16  Q.  Where were you working prior to the time that you started

17  working for the Naval sub base with the Department of Defense?

18  A.  I was actually working for the Department of the Army prior

19  to the Department of the Navy so under the Department of

20  Defense.

21  Q.  And where was that?

22  A.  At the Rock Island Arsenal.

23  Q.  How long did you work there?

24  A.  I was there three years before I went to the Navy.

25  Q.  And where did you work before you worked for the Department

1  of Defense?

2  A.   I had been a DOD contractor for about eight years prior to

3  that, but I worked prior to that with the Department of Veterans

4  Affairs and then --

5  Q.   I'm sorry.

6  A.   And prior to that I was at the Department of the Army.

7  Q.   My question is you have a security clearance also?

8  A.   Correct.

9  Q.   And it is a secret security clearance, is that correct?

10  A.   Correct.

11  Q.   What are your duties, not in detail, but tell us what your

12  occupational title is, please.

13  A.   Contract specialist.

14  Q.   How far do you work from the Naval base?

15  A.   About 10, 15 minutes.

16  Q.   Do all of your kids have passes for the Naval base and have

17  IDs related to the Navy base?

18  A.   No, just LaMark had his.

19  Q.   Okay.

20  A.   They can get on with an ID, but LaMark actually can get on

21  by himself.

22  Q.   Okay.  And I want to ask you a couple questions about your

23  home.

24          You read the Motion I sent down or the document I sent

25  down for your review in terms of release, is that correct?

1   A.   Yes.

2   Q.   All right.   And I am referring to Paragraph 12 in the

3   material that I filed.

4          I explained to you that it is possible if LaMark is

5   released he would be subject to what is called electronic

6   monitoring, meaning he would have a bracelet on and have a GPS

7   system tied to his travels.

8          Do you understand that?

9   A.   Yes, I do.

10   Q.   And you would be willing to make sure that he abided by

11   that, keep it -- make sure that he kept it charged and would, in

12   fact, comply with all terms and conditions of that?

13   A.   Yes.

14   Q.   I know you told me about a curfew that he had when he was in

15   high school.

16          If the Court imposes a different curfew on pretrial,

17   would you agree to abide by that curfew and if he violated it,

18   you would be required to let them know that he violated it?

19   A.   Definitely.

20   Q.   Except for going to work, if he was charged with home

21   confinement, would you make sure that he complied with that

22   also?

23   A.   Yes.

24   Q.   Would you assist him with getting employment if he went back

25   to Lowe's and make sure he got back and forth to home from his

1  employment?

2           Would you agree to do that?

3  A.  Yes.

4  Q.  And if he needed substance abuse, because I talked to you

5  briefly about some drinking that he had, could you put him in

6  substance abuse to make sure that he completed an evaluation

7  related to that?

8  A.  Yes.

9  Q.  A couple other things I want to mention with you to go over

10  and that is you assisted with getting the medical records sent

11  to me so I could send them to the Marshals Office -- send them

12  to Grady County, is that correct?

13  A.  Correct.

14  Q.  If I understand it, maybe I didn't quite understand that,

15  you sent a letter to -- was it Grady County or to the Marshals

16  Office?

17  A.  I sent several e-mails, I think there was one to the

18  marshals, there may have been one to Grady, I am not 100 percent

19  sure.

20  Q.  And what were you trying to --

21  A.  But for sure the marshals.

22  Q.  And what were you trying to articulate when you sent those

23  about Lamark's medical condition?

24  A.  He was confused of the process that was going on at the

25  Grady jail so I was kind of just trying to let them know that he

1  was in some pain and he needed some sort of attention from his

2  previous -- or from his recent hospital stay for pancreatitis.

3  Q.  And did you explain to them the nature of what was going on

4  in Grady County, particularly when they thought someone had

5  COVID-19 there?

6  A.  Can you repeat that?

7  Q.  Yeah.  When you found out there might have been a case of

8  COVID-19 at Grady County, did you explain to them that he may be

9  in more jeopardy?

10  A.  Explain to LaMark?

11  Q.  No, explain to the people in your e-mails.

12  A.  I think I may have.  I am not 100 percent sure.

13  Q.  Okay.  But you did have some concerns, is that correct?

14  A.  Oh, definitely, definitely.

15  Q.  And did he go to this hospital thing for -- when he was in

16  the hospital for a while related to the pancreatitis prior to

17  his arrest?

18  A.  Yes.

19  Q.  And was he -- did he have an appointment scheduled on the

20  date of his arrest to go back in for treatment?

21  A.  To see a specialist, correct.

22  Q.  All right.  And what was the purpose of going to the

23  specialist?

24  A.  It was a G.I. specialist and it was to just follow up from

25  the hospital stay.

1  Q.  And were you told if there were any flareups or problems

2  with his medical conditions, what could happen to LaMark?

3  A.  They told us that any damage to his pancreas is irreversible

4  so we need to make sure that we stayed on the diet that they

5  told us that he had to stay on and if the pain gets worse, then

6  we'd have to go back to the hospital.

7  Q.  Last questions I have for you, if -- could you place your

8  computers, I know you have to work with -- for the Department of

9  Defense, on passwords and would agree that you would not give

10  LaMark access to those passwords?

11  A.  Yes.

12  Q.  What about your daughter's computer?  How would you control

13  that?

14          I know she is 18, if she is like my kid, she's at home

15  taking classes, so my question is how would you control that

16  password to be sure he couldn't get into the Internet?

17          What would you do?

18  A.  So we could change the Internet password, first of all.

19          Second of all, our government computers are track

20  enabled and those have super secret passwords to it.  Our

21  regular computers and my daughter's computer, we all have

22  passwords into our computers that we don't share amongst each

23  other.

24  Q.  Now, I understand you have a Smart TV.  I think I may have

25  seen a picture, I didn't know if it was a Smart TV or not.

1              Is there any way you could deny LaMark access to that?

2   A.  I believe if we change pass codes, yeah, I think there

3   should be a way.  If we change pass codes to the Internet, then

4   the Internet wouldn't be operable on that TV.

5   Q.  And if he were to have any difficulty at all, would you and

6   your husband agree with the Court that you would get in touch

7   with the Court advising them of the difficulty you were having

8   with LaMark?

9   A.  Definitely.

10          MR. PARRISH:  Nothing further.

11          THE COURT:  Brief questions?

12                        CROSS-EXAMINATION

13  BY MS. SCHNEIDER:

14  Q.  Ms. Combs, have you been tested for COVID-19?

15  A.  No.

16  Q.  And the discharge paperwork from the defendant's

17  hospitalization in February, you would agree that that's

18  accurate, what has been provided to the Court?

19  A.  Yes.

20          MS. SCHNEIDER:  Nothing further.

21          THE COURT:  Anything else, Mr. Parrish?

22          MR. PARRISH:  No, Your Honor.  Thank you.

23          THE COURT:  Ms. Combs, thank you.  You are excused.

24  You can hang up now.  We are going to hang up and thank you very

25  much.

1            THE WITNESS:  Thank you very much.

2            THE COURT:  Mr. Parrish, do you have additional

3   evidence?

4            MR. PARRISH:  No, Your Honor.

5            THE COURT:  We are going to take a recess.  Counsel,

6   we will come back and I will hear arguments from each of you.

7            We have been going two hours.  I know what is before

8   me so I would like you to crystalize it in five minutes or so.

9            Can you do that?

10           MR. PARRISH:  We can, Judge.  Thank you.

11           THE COURT:  Thank you.  We're adjourned.  I'm sorry.

12   We're in recess.

13           (A recess was taken from 3:27 p.m. until 3:37 p.m.)

14           THE COURT:  Have a seat, please.

15           We are back on the record.

16           Mr. Parrish, just before we broke, you concluded with

17   your evidence, correct?

18           MR. PARRISH:  I did, Judge.

19           THE COURT:  Will you test your mic?

20           MR. PARRISH:  I'm sorry.  I did, Judge.  Thank you.

21           THE COURT:  Ms. Schneider, is there further evidence

22   for the government?

23           MS. SCHNEIDER:  No, Your Honor.  Just argument.

24           THE COURT:  You may proceed.

25           MS. SCHNEIDER:  Thank you.

1          The -- this case does involve the rebuttable

2    presumption in favor of detention and the nature and

3    circumstances of this offense are serious, even post Indictment

4    we have received evidence that there may be distribution of

5    child pornography occurring; but he -- the defendant has been

6    producing or attempting to produce a large amount of child

7    pornography, preying on and grooming young girls ages 14 to 16

8    years old.  He also entices young girls into having sex with

9    him.

10         The weight of the evidence is strong.  There is a

11   plethora of images and videos on his -- both of the devices

12   seized by law enforcement, as well as social media accounts that

13   have been recovered, which show consistent reports among the

14   victims of the defendant's MO and additionally, defendant is

15   visible and identifiable in some of the videos that were found

16   on his phone.

17         The pictures --

18         THE COURT:  Would you just give me a ballpark of what

19   you mean numberwise, what you mean by "plethora"?

20         MS. SCHNEIDER:  One moment.

21         (An off-the-record discussion was held.)

22         MS. SCHNEIDER:  It probably doesn't go over 1,000.

23         THE COURT:  It does not go over 1,000?

24         MS. SCHNEIDER:  Correct.

25         The history and characteristics of the defendant, he

1   calls himself the Freshman Slayer, and again has engaged in this

2   conduct since turning 18.   In addition to the child pornography,

3   there is a history of reported sexual assaults.   There are also

4   Snapchat messages with some images that -- of girls who have not

5   yet been identified, but this reveals a persistent grooming

6   pattern by the defendant which means that he poses a significant

7   danger to the community.

8          The victims all reside in this area and he -- they

9   have reported some harassment or intimidation by the defendant

10  and his friends pre-Indictment so, if released, the risk to

11  these victims is substantial.

12         Also because he has threatened to disseminate images

13  of at least one of the victims, minor victim number two, and

14  because he possessed these images on both devices that were

15  seized, it is unclear whether he still possesses child

16  pornography that he would have access to that he could expose

17  the victims or delete or get rid of evidence which he has tried

18  to do when he lied to Detective Johnson about the location of

19  his phone in an attempt to try to delete evidence on it before

20  giving it over as a result of the search warrant.

21         The defendant is a predator and he has demonstrated

22  that he cannot stop this behavior evidenced by the Facebook

23  results that came post Indictment that revealed he's continued

24  this behavior since moving to Georgia and continued it up until

25  at least February 27th, which is two weeks before he was

1  arrested on this warrant, so despite the fact that he has known

2  that these investigations were ongoing and that his multiple

3  devices have been seized, he has continued this behavior.  That

4  makes him a significant danger to the community as well as the

5  victims.

6          Regarding flight, the family moved to Georgia despite

7  knowing about these investigations.  The defendant's father

8  admitted that he knew about these investigations since 2018.  He

9  knew that two of the defendant's cell phones had been seized,

10  but yet moved away simply because his daughter went to college.

11          Additionally, he is now facing charges carrying

12  mandatory minimums of 15 years in prison.  That gives one a

13  significant motivation to flee.

14          Regarding the Pretrial Services Report, there are some

15  untruths noted in there.

16          First of all, that the defendant noted no physical

17  issues or ailments, it states that the -- he's in excellent

18  physical health with no medical problems reported.  Because this

19  was done in Georgia, the government did contact the probation

20  officer who did this interview, shared that information with the

21  defense counsel yesterday.  She reported that her notes reflect

22  the fact that the defendant reported no physical issues, that he

23  was asked and reported none, so that would be a false statement

24  to probation.

25          Additionally, under the Substance Abuse section, it

1   states he only -- the defendant only admitted to consuming

2   alcohol, but there is evidence in the Snapchat -- defendant's

3   Snapchat that he also smokes marijuana so that's an omission or

4   false statement to probation already.

5          Regarding the third-party custodians, his parents

6   would not be appropriate not only because they live out of

7   state, but because that is where the defendant was residing the

8   entire time he was committing these offenses and, in fact, some

9   of the uncharged relevant conduct occurred at their house.

10         The defendant's father admitted that while he knew

11  that there were investigations ongoing, he admitted he did not

12  know the extent of those investigations so it would beg the

13  question that he would not know what the defendant was doing

14  when he was even under his own roof.  He also has minor siblings

15  in the home and he cannot have contact with minors.

16         Moving on to the COVID-19 issue, none of these people

17  who are put up as potential third-party custodians have been

18  tested for COVID-19 so there is absolutely no evidence that he

19  would be in a better position with them than in the Muscatine

20  County Jail which to my knowledge has not had a positive case of

21  COVID-19 reported.

22         Additionally, the defendant claims to have this

23  pancreatitis issue.  I will note that on Docket 17, which is the

24  document that counsel has been referring to as, quote, unquote,

25  medical records, which is actually just a discharge summary,

1   notes that the defendant was in the hospital for about three

2   days, a little over three days, not a week as his father

3   testified, and that his discharge was just to start with a low

4   fat diet, that was the extent of it, and that seems to be

5   similar to what his stepmother testified to that he just needs

6   to watch his diet.

7          Additionally, I would note that on page five of this

8   report it indicates that what he was told to do upon discharge

9   was just follow up with his primary care provider; but it was --

10  he was told to do that within one to three days.  He was

11  discharged on February 6th.  He was not arrested on this case

12  until March 11th, so if he didn't have an appointment until

13  March 11th or thereafter, they weren't taking this as seriously

14  as they are making it out to be at this point as they were not

15  following the doctor's orders at that time.

16         Additionally, there is no -- there has been no

17  evidence supported by medical doctors that would say that

18  pancreatitis puts the defendant in any more susceptible risk for

19  COVID-19.  There are some allegations made in the defendant's

20  filings, but nothing that is supported.

21         I also would like to point out that as of this morning

22  Georgia has over 24,000 COVID-19 cases and over 1,000 deaths and

23  Florida, of which they are on the border of, has almost 32,000

24  positive cases and almost 1,200 deaths, while Iowa has 6,000

25  cases and 136 deaths, so it begs the question that moving to

1  Georgia with people who have not been tested puts him in any

2  less risk of COVID-19.

3          The Muscatine County Jail is taking appropriate

4  precautions, there's no evidence that the defendant is

5  particularly susceptible, so he should not be -- there's no

6  extraordinary circumstances that would require his release.

7          As a result, as Pretrial Services also concluded, the

8  defendant should remain detained.  Thank you.

9          THE COURT:  Thank you.

10          Mr. Parrish?

11          MR. PARRISH:  Thank you, Your Honor.

12          At issue here is are there certain conditions that

13  could be laid out for Mr. Combs to allow him to be released.

14          I think a couple important factors should be

15  addressed.  Number one, the officer himself testified there's

16  been no contact with victim one, two, or three in almost a year.

17  I think that's significant.

18          Second of all, if they had wanted to conduct some

19  investigation before the arrest as to Mr. Combs' conduct in

20  Georgia, they obviously could have done that, but nothing has

21  come forward with regard to that.

22          Third, the allegation, Judge, with regard to

23  misconduct, I think the officer admitted, Officer Johnson

24  admitted, no charges were filed in State Court, no reports were

25  filed either with Clinton County nor with Scott County so I

1   think that is significant in almost two years as we laid out.

2          The other thing I think is extremely important, Judge,

3   is when a 20-year-old comes into the courtroom, you have to look

4   at his family and their background.  I don't think any

5   background could be more stellar than Mr. and Mrs. Combs.  They

6   both have security clearances with the Department of Defense,

7   they both stated with a degree of clarity what they're willing

8   to do to -- with a degree of clarity what they would do to make

9   sure their son was in compliance.

10          I think also tracking their son in the manner that

11  they did by getting -- agreed, it was only a discharge report,

12  but very few people within four or five days can get a discharge

13  report.  Additional medical reports I am sure could be provided.

14          Mr. Combs has indicated what his background has been,

15  I think it was my mistake as to a deputy, and I think -- as I

16  recall I think I might have assisted him back when he was

17  discharged, along with a female, first deputy, I represented her

18  also from the Scott County Sheriff's Office and they both

19  received some degree of relief from those two cases; but that

20  was years ago.  He has then gotten a security clearance since

21  then, I think he represented himself to be a correctional

22  officer.  I think that is correct.  It is my mistake with regard

23  to the deputy.

24          Additionally, Your Honor, I think that the home, as

25  you can see from the photographs, is a good solid home.  The

1   educational background of the parents are solid.  I think a

2   Pretrial Order could be set up to allow him to work with his

3   counsel to get prepared for this case and obviously I don't want

4   to get into the deep merits of the case, but I think our

5   allegation that there are suppression issues of substance

6   involved here in this case when Officer Johnson has admitted it

7   started in 2018, nothing was done, and no further investigation

8   since the early part of 2019, they blame I guess the DCI for

9   putting it on the back burner at first, but obviously they have

10  to step up and take some responsibilities as to why it didn't go

11  earlier.

12        I am puzzled by the government's argument that the

13  family moved to Georgia to take a job with the Department of

14  Defense, not hiding their identity, they found it on Google, it

15  was easy to find, they knew he worked for the Department of

16  Defense here, also he knew he worked there, knew he worked for

17  Arby's, that would have been an easy place to track him, so the

18  idea that the government is arguing that there is some secreting

19  of this family is just bizarre.  I don't understand that

20  argument.

21        The officer, I think Mr. Combs acknowledged, that had

22  they told him to contact them, they would have done that.  The

23  other siblings live in Davenport, the sister lives in Davenport,

24  Ms. Smith, so I don't, Judge, think you should take much

25  credence with regard to that argument.

1          What we do believe, Judge, that our brief -- we really

2     kind of outlined the steps that the Court has to value in

3     determining this, so I don't want to argue -- make any legal

4     argument.

5          We believe Mr. Combs is an excellent candidate for

6     release.  We believe COVID-19 does tie into this a little bit,

7     the lack of testing when there are no symptoms as we know from

8     just watching the news, following this the office that I run, if

9     you are not having symptoms you can't get tested; but being tied

10    with the military, I am sure they would get some priority, so we

11    would ask the Court allow pretrial to do an interview, transfer

12    him to Georgia, that's our first priority.  If they are

13    concerned about the No-Contact Order with these other young

14    ladies here, that's the best place for him.

15         You can tell from his parents' background and material

16    and information they provided that these are stellar people and

17    if any candidate deserves to be released, Judge, it is Mr.

18    Combs.  Thank you.

19         THE COURT:  Thank you.

20         Anything else, Ms. Schneider?

21         MS. SCHNEIDER:  Just briefly, that with the parents

22    who are stellar as Mr. Parrish paints them to be, the defendant

23    still ended up engaging in this behavior and so that is not a

24    place that he should be at this time.  Thank you.

25         THE COURT:  So first of all, I want to confirm, Mr.

1   Combs, have you been able to see and hear everything that has

2   happened in this hearing today?

3           THE DEFENDANT:  Yes.

4           THE COURT:  And do you feel that you were able to

5   adequately participate in this hearing today?

6           THE DEFENDANT:  Yes.

7           THE COURT:  I understand you didn't say much or have

8   to say much, in fact, but were you able to see and observe

9   everything and hear everything going on?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Okay.  Good.  I find this has been a

12  reliable electronic means to conduct this hearing today.

13          Concerning the government's request for detention, I'm

14  guided by several principles.

15          First is that Mr. Combs is entitled to the presumption

16  of innocence at all times.  Nothing that takes place or that I

17  say is intended or should be construed to affect the

18  presumption.  The sole purpose of this hearing is to determine,

19  notwithstanding that presumption, whether Mr. Combs should be

20  detained pending trial.

21          The Bail Reform Act guides my decision and provides

22  that unless a Court finds there are no conditions which will

23  reasonably assure, that does not mean guarantee, but reasonably

24  assure the appearance of the defendant or reasonably assure the

25  safety of any other person in the community, the defendant must

1   be released.  If I cannot find those conditions exist to

2   reasonably assure those things, then I am required by the Act to

3   hold a defendant in custody.

4          The government argues Mr. Combs is both a risk of

5   flight and a danger.  The government bears the burden of proof

6   at all times and must show by a preponderance of the evidence

7   there are no conditions to reasonably assure Mr. Combs'

8   appearance.

9          As far as danger is concerned, it must show by clear

10  and convincing evidence, a higher burden, that there are no

11  conditions to reasonably assure the safety of the community.

12         The government argues that in this case it is entitled

13  to a rebuttable presumption, that detention is appropriate

14  because of the nature of the crime charged and that is with

15  child victims and Mr. Combs does not dispute that presumption

16  exists.  I do find there is a rebuttable presumption; but it is

17  rebuttable.  That means that it places on Mr. Combs the burden

18  of showing some credible evidence to overcome it or rebut it.

19  That is not a heavy burden.  Even with that burden, the

20  government still bears the ultimate burden of proof in this

21  case.

22         I find he has rebutted the presumption.  He's

23  presented two alternative, credible release plans, either with

24  his parents in Georgia or his aunt and uncle in Davenport and so

25  he's rebutted the presumption; but even though the presumption

1    is rebutted, it is still a factor to consider in determining the

2    question of detention.

3            Turning to that question, there are four specific

4    factors the Act requires me to consider.  First is the nature

5    and circumstances of the alleged offense; second is the weight

6    of the evidence against the defendant; third is the history and

7    characteristics of the defendant.  That includes many things:

8    Physical condition, family ties, employment, past conduct,

9    criminal record, things of that nature, and that is not an

10   exclusive or exhaustive list.  The fourth factor is the nature

11   and seriousness of the danger to others or the community if the

12   defendant is to be released.

13           The government made a Motion to Strike concerning

14   Dockets 29 and 30.  That Motion is denied.  Those documents are

15   in the way of a brief setting forth law and in the nature of a

16   trial brief and also contain some information that for the most

17   part has been presented here today, and so with the relaxed

18   nature of the Rules of Evidence and the nature of the legal

19   statutes and cases set forth in those documents, the Motion to

20   Strike is denied.  I have reviewed those and given those

21   consideration.

22           I have also given consideration to all the evidence

23   that has been presented here today, both by the way of proffer

24   and by the way of live or telephone testimony.  I know that Mr.

25   Parrish made a Motion or an argument concerning reports that may

1   or may not have been provided to him related to Rule of Criminal

2   Procedure 26.2.  I understand what he is saying there concerning

3   the proffer and the extent that it may have been -- the proffer

4   was based upon reports outside of Detective Johnson's reports;

5   but from the testimony provided, Detective Johnson has been in

6   charge of this investigation from November and December of 2018

7   and executed a search warrant in June of 2018 and so the only

8   information that he wouldn't have outside the general -- he

9   would certainly have the nature -- information of his own

10  personal knowledge concerning the general nature of the June

11  2018 allegations for the purpose for which he was executing the

12  search warrant and so I don't find, except for some of the

13  details in that June 2018 matter, that there's really been a

14  foundation laid to show exclusion would be appropriate.

15        I have given consideration also to the recommendation

16  of pretrial services as well.

17        Looking at the factors, the nature and circumstances

18  of this case are serious and point toward detention.  Each of

19  the crimes alleged have a minimum prison term, one would be five

20  years, Counts 1 and 2 have a 15-year minimum, that's

21  significant.

22        The nature and circumstances are also significant

23  given that Counts 1 and 2 involve production and Count 3

24  involves enticement.  Those are all active measures as it

25  relates to child pornography and point toward detention.

1                The weight of the evidence is strong.  Detective

2      Johnson testified as to a lot of the evidence.  The evidence

3      does not appear to be, from what he said, based upon just one

4      source, there's multiple sources, there's multiple alleged

5      victims, there's different avenues that Detective Johnson has

6      approached to obtain the evidence, by way of third-party search

7      warrants or subpoenas, statements from victims, statements from

8      other individuals as well.  I understand the -- and so the

9      weight of the evidence points toward detention.

10               I do want to comment on Mr. Parrish's comments that

11     there appear to be issues of substance as it relates to

12     suppression.  It was not apparent to me from what was presented

13     here today as to what those are.  There may very well be.

14               As it relates to delay, I think that was discussed in

15     the nature of suppression issues.  To me delay does not speak to

16     suppression issues, but they go to whether or not release or

17     detention is appropriate given the passage of time in the case.

18     The history and character -- so the weight of the evidence

19     points toward detention.

20               The history and characteristics of Mr. Combs, that

21     strongly points toward release.  He has no criminal history, he

22     has a high school diploma, he has a good work history, it shows

23     employability up until the time of his arrest.  He continued the

24     employability and employment from the time of his move to

25     Georgia.  He does not have significant drug or alcohol abuse.

1   His physical condition does not appear to be limiting in that

2   regard and I agree with Mr. Parrish's characterization of his

3   parents as a stellar release plan.  They really are.  The

4   background is strong and significant, they have a solid release

5   plan that is thought through, and the Court has confidence that

6   they will follow through with that.

7          There are some concerns about the release plan to

8   Georgia and that relates to the minor brother of Mr. Combs who

9   would be residing in the house, that's a problem.  I am not

10  concerned about the electronics in the house, that is something

11  that, maybe except for Smart TV's, I am not sure about that one,

12  but everything else can be pretty well password protected in

13  that regard and so the history and characteristics, release

14  plan, those both point toward release and a strong candidate for

15  release based upon those factors.

16         The final factor is the danger and seriousness of the

17  danger to other individuals or the community at large if Mr.

18  Combs were to be released.  For me that's the determinative

19  factor and considering that factor, I do find the government has

20  met its burden of proof to show detention is required by clear

21  and convincing evidence based upon danger to others or the

22  community.

23         The crimes alleged in this case, notwithstanding the

24  burden or the presumption of innocence, are disturbing.

25  Multiple victims, three different victims, both a number of

1 years younger than Mr. Combs.  Mr. Combs was not in high school

2 at the time this occurred which might blur or make the age

3 difference less dramatic.  There appeared to be grooming, there

4 appeared to be predatory patterns of behavior, and the pattern

5 of conduct, as shown today by the government, goes beyond just

6 these three victims, there are three other potential victims as

7 well, it involves hands-on contact, it involves potential sexual

8 assaults, there is a grooming pattern, and there were reports of

9 harassment, threats to disseminate, and continued grooming

10 behavior going on from October until up to the time or close to

11 the time of Mr. Combs' arrest with other potential -- another

12 potential victim on Facebook.  That history and pattern show

13 that there are no conditions to reasonably assure the safety of

14 these other individuals to these behaviors or the community.

15    I also note a lot of this or a significant amount of

16 this conduct that we have heard about today all occurred after

17 Mr. Combs knew he was being investigated by the police and had

18 his first cell phone seized and a blanket in June of 2018.  All

19 the conduct we talked about happened after that and he knew

20 these things were going on.

21    For those reasons I find detention is appropriate.

22 Mr. Combs' custody is remanded to the U.S. Marshals who shall

23 bring him to court for all hearings that require his presence as

24 allowed under the current COVID pandemic safety procedures.

25    Mr. Combs is advised that he may seek review of this

1   Order to a Magistrate Judge such as myself if there is new

2   information that becomes available to him that would have an

3   impact on the question of detention not known to him at this

4   time.  He also may appeal my ruling to a District Judge.

5           Ms. Schneider, is there anything further for the

6   government?

7           MS. SCHNEIDER:  No, Your Honor.  Thank you.

8           THE COURT:  Mr. Parrish, anything further for Mr.

9   Combs?

10          MR. PARRISH:  No, Your Honor.

11          Just your one finding, I believe if you go back to the

12  2018 date, he was in high school right before that with that

13  allegation.  I know you make that as a finding, but I believe

14  graduation was not till about that same time.

15          THE COURT:  Okay.

16          MR. PARRISH:  And that's with regard to just the one

17  finding.

18          THE COURT:  He may or may not have been in high school

19  at that time, but it was --

20          MR. PARRISH:  Right.

21          THE COURT:  -- it is close and we are not sure about

22  that, the rest were after his graduation.

23          Anything further, Mr. Parrish?

24          MR. PARRISH:  No, Your Honor.

25          THE COURT:  Thank you.  We are adjourned.
            (Proceedings concluded at 4:05 p.m., April 28, 2020.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Linda Faurote-Egbers, Federal Official Realtime

4  Court Reporter, in and for the United States District Court for

5  the Southern District of Iowa, do hereby certify that pursuant

6  to Section 753, Title 28, United States Code, that the foregoing

7  is a true and correct transcript of the stenographically

8  reported proceedings held in the above-entitled matter and that

9  the transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11

12

13           Dated this 4th day of May, 2020.

14

15

16

17           /s/ Linda Faurote-Egbers
              Linda Faurote-Egbers, CSR NO. 622(IA)
18          FCRR, RMR, RPR, CSR (IA and IL)
              FEDERAL OFFICIAL COURT REPORTER
19

20

21

22

23

24

25